**EQUITY-LINKED INVESTORS, L.P. and Equity–Linked Investors–II, Plaintiffs,**

**v.**

**Thomas A. ADAMS, Sharon B. Webster, Paul O.P. Ts'o, Robert E. Klem, Genta Incorporated, the Aries Funds and Aries Domestic Fund, L.P., Defendants.**

**Civil Action No. 15513.**

Court of Chancery of Delaware, New Castle County.

Submitted: April 1, 1997.
Decided: April 25, 1997.

Kevin G. Abrams, Thomas A. Beck, J. Travis Laster, Peter B. Ladig of Richards, Layton & Finger, Wilmington (Irwin H. Warren, Brian S. Rosen, Larren M. Nashelsky of Weil, Gotshal & Manges, L.L.P., New York City, of counsel), for Plaintiffs.

Martin P. Tully, William M. Lafferty, David J. Teklits of Morris, Nichols, Arsht & Tunnell, Wilmington (Walter J. Robinson, III, Kirke M. Hasson, Bruce A. Ericson of Pillsbury, Madison & Sutro, L.L.P., San Francisco, CA, of counsel), for Defendants Genta Corporation, Thomas H. Adams, Robert E. Klem, Paul O.P. Ts'o, Sharon B. Webster.

Anthony W. Clark of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Defendants Aries Domestic Fund, L.P., the Aries Fund.

### OPINION

ALLEN, Chancellor.

The case now under consideration involves a conflict between the financial interests of the holders of a convertible preferred stock with a liquidation preference, and the interests of the common stock. The conflict arises because the company, Genta Incorporated, is on the lip of insolvency and in liquidation it would probably be worth substantially less than the $30 million liquidation preference of the preferred stock. Thus, if the liquidation preference of the preferred were treated as a liability of Genta, the firm would certainly be insolvent now. Yet Genta, a bio-pharmaceutical company that has never made a profit, does have several promising technologies in research and there is some ground to think that the value of products that might be developed from those technologies could be very great.[1] Were that to occur, naturally, a large part of the "upside" gain would accrue to the benefit of the common stock, in equity the residual owners of the firm's net cash flows. (Of course, whatever the source of funds that would en-

able a nearly insolvent company to achieve that result would also negotiate for a share of those future gains—which is what this case is about). But since the current net worth of the company would be put at risk in such an effort—or more accurately would continue at risk—if Genta continues to try to develop these opportunities, any loss that may eventuate will in effect fall, not on the common stock, but on the preferred stock.

As the story sketched below shows, the Genta board sought actively to find a means to continue the firm in operation so that some chance to develop commercial products from its promising technologies could be achieved. It publicly announced its interest in finding new sources of capital. Contemporaneously, the holders of the preferred stock, relatively few institutional investors, were seeking a means to cut their losses, which meant, in effect, liquidating Genta and distributing most or all of its assets to the preferred. The contractual rights of the preferred stock did not, however, give the holders the necessary legal power to force this course of action on the corporation. Negotiations held between Genta's management and representatives of the preferred stock with respect to the rights of the preferred came to an unproductive and somewhat unpleasant end in January 1997.

Shortly thereafter, Genta announced that a third party source of additional capital had been located and that an agreement had been reached that would enable the corporation to pursue its business plan for a further period. The evidence indicates that at the time set for the closing of that transaction, Genta had available sufficient cash to cover its operations for only one additional week. A Petition in Bankruptcy had been prepared by counsel.

This suit by a lead holder of the preferred stock followed the announcement of the loan transaction. Plaintiff is Equity–Linked In-

---

1. Were one highly confident that all available information about those prospects was widely available and that non-public capital markets were highly efficient, one would be skeptical that a disjunction between liquidation value and management's envisioned long-term value could exist. Very good information about these research properties is not publicly available, however, and the market for bank loans or small private placements is surely imperfectly efficient. In all events the law admits of the possibility of such disjunction.

vestors, L.P. (together with its affiliate herein referred to as Equity–Linked), one of the institutional investors that holds Genta's Series A preferred stock. Equity–Linked also holds a relatively small amount of Genta's common stock, which it received as a dividend on its preferred. The suit challenges the transaction in which Genta borrowed on a secured basis some $3,000,000 and received other significant consideration from Paramount Capital Asset Management, Inc., a manager of the Aries Fund (together referred to as "Aries") in exchange for a note, warrants exercisable into half of Genta's outstanding stock, and other consideration. The suit seeks an injunction or other equitable relief against this transaction.

While *from a realistic or finance perspective*, the heart of the matter is the conflict between the interests of the institutional investors that own the preferred stock and the economic interests of the common stock, *from a legal perspective*, the case has been presented as one on behalf of the common stock, or more correctly on behalf of all holders of equity securities. The legal theory of the case, as it was tried, was that the Aries transaction was a "change of corporate control" transaction that placed upon Genta special obligations—"Revlon duties"—which the directors failed to satisfy.

While *from a realistic or finance perspective*, the heart of the matter is the conflict between the interests of the institutional investors that own the preferred stock and the economic interests of the common stock, *from a legal perspective*, the case has been presented as one on behalf of the common stock, or more correctly on behalf of all holders of equity securities. The legal theory of the case, as it was tried, was that the Aries transaction was a "change of corporate control" transaction that placed upon Genta special obligations—"Revlon duties"—which the directors failed to satisfy.

While the facts out of which this dispute arises indisputably entail the imposition by the board of (or continuation of) economic risks upon the preferred stock which the holders of the preferred did not want, and while this board action was taken for the benefit largely of the common stock, those facts do not constitute a breach of duty. While the board in these circumstances could have made a different business judgment,[2] in my opinion, it violated no duty owed to the preferred in not doing so. The special protections offered to the preferred are contractual in nature. *See Ellingwood v. Wolf's Head Oil Refining Co.*, Del.Supr., 38 A.2d 743, 747 (1944). The corporation is, of course, required to respect those legal rights. But, aside from the insolvency point just alluded to, generally it will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, *etc.*, of preferred stock, where there is a conflict. *See Katz v. Oak Industries, Inc.*, Del. Ch., 508 A.2d 873, 879 (1986). The facts of this case, as they are explained below, do not involve any violation by the board of any special right or privilege of the Series A preferred stock, nor of any residual right of the preferred as owners of equity.

As I have said, that is, I think, the heart of this matter. But the case has been presented, not as a preferred stock case, but as a "Revlon" case. The plaintiff now purports to act as a holder of common stock. In effect, the plaintiff says: "Certainly the board can raise funds to try to realize its long-term business plan of developing commercial products from the company's research, (even though we holders of preferred stock are bearing the risk of it), but if the financing it arranges constitutes a 'change in corporate control,' then it must proceed in a way that satisfies the relevant legal test". Relying

**2.** *See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, *Del*. Ch., C.A. No. 12150, Allen, C., 1991 WL 277613 (Dec. 30, 1991) Mem. Op. at n. 55 (where foreseeable financial effects of a board decision may importantly fall upon creditors as well as holders of common stock, as where corporation is in the vicinity of insolvency, an independent board may consider impacts upon all corporate constituencies in exercising its good faith business judgment for benefit of the "corporation"); *Orban v. Field*, Del.Ch., No.12820, 1997 WL 153831 (Apr.1,1997) (board breached no duty to "underwater" common by facilitating an arm's lenght merger over their objection that, as a practical matter benefitted voting preferred stock.).

upon the teachings of *Paramount Communications v. QVC Network,* Del.Supr., 637 A.2d 34 (1993), plaintiff argues that the board did not satisfy the relevant legal test because, it says, defendants did not search for the best deal. Specifically, the board did not ask the holders of the preferred stock what they would have paid for the consideration given by Genta to Aries. The preferred, plaintiff says, would have "paid more" and that *would have benefited the common or all equity.*

For the reasons set forth below, following the recitation of relevant facts, I conclude that the directors of Genta were independent with respect to the Aries transaction, acted in good faith in arranging and committing the company to that transaction, and, in the circumstances faced by them and the company, were well informed of the available alternatives to try to bring about the long-term business plan of the board. In my opinion, they breached no duty owed to the corporation or any of the holders of its equity securities. Moreover, if tested judicially by a standard other than the "business judgment rule," the board's actions continue to appear sound. That is, in the circumstances, the board's actions appear reasonable in relation to the board's goal of achieving its valid business plan. While the board had no legally enforceable means to assure that the Aries transaction would achieve that goal, that transaction offered several attributes that permitted the board reasonably to conclude that it was the only available alternative. *See* p. —— below ("Why a Revlon auction or other bidding with the preferred participating would not maximize value of common stock ..."). Indeed, in my opinion, given the history of the parties as of January 1997, it would be perfectly reasonable to conclude that any proposal that the plaintiff might make would be aimed at achieving, not the business plan the board legitimately sought to facilitate, but the dismantling of the company. While certainly some corporations at some points ought to be liquidated, when that

point occurs is a question of business judgment ordinarily and in this instance.

I begin with the facts out of which the dispute arises.

## I.

*A. The Company:* Genta was started in 1988 by Dr. Thomas Adams who has served since as its CEO and Chairman. It is in the bio-pharmaceutical business with its principal facility in San Diego. It has three components. First, it owns various intellectual property rights with respect to a genetic research area known as "antisense". Its antisense activities involve research, development, and testing directed towards developing a treatment for certain cancers. It has developed no commercial products from its intellectual properties. Second, through a wholly owned subsidiary, JBL Scientific Inc., Genta manufactures generic chemicals, pharmaceuticals, and intermediate products used by bio-pharmaceutical companies, including its own antisense business. It has a positive cash flow. Thirdly, Genta owns a 50 % interest in a joint venture with SkyePharma PLC[3], which is involved in the development of a new oral drug delivery technology. It has not yet produced a positive cash flow. Indeed, both the antisense and drug delivery products are still entirely at the development stage. The company has never made a profit and has expended almost $100 million on research, development, and overhead since its founding. While this sounds bleak, nevertheless, it is the case that some of its technologies, if they could be developed into marketable products, would be exceptionally useful and valuable.

As of the summer of 1996, when the events at issue began, Genta's board of directors had seven members: two officers (Dr. Adams, the CEO and Chairman, and Dr. Klem, the Vice–President); three outside directors who subsequently have left the board (James Blair, Samuel Colella[4], and David Hale[5]) and two outside directors that remain

---

3. SkyePharma acquired its 50% joint venture interest from Genta's original joint venture partner, Jagotech A.G.

4. Mr. Colella is a venture capitalist with control over significant Genta stockholdings.

5. Mr. Hale has extensive experience in the industry. He was and is the CEO of another biotech company, Genesia Sicor, Inc.

on the board: Dr. Ts'o, a co-founder of Genta who has a consulting agreement with Genta and receives fees for technology he has licensed to the company, and Dr. Webster, who is an international economics consultant with past board experience.

**B. Capital Structure:** As of January 28, 1997, the capital structure of Genta comprised 39,991,626 shares of common stock; 528,100 shares of Series A·preferred stock; and 1,424 shares of Series C preferred stock outstanding. The original investment by the common stock had been about $58 million. The Series A preferred had originally invested $30 million. Something less than $10 million had been raised from later classes of preferred, much of which had subsequently been converted to common stock.

The Series A preferred stock was issued in 1993 at $50 per share. It carries a $50 per share liquidation premium ($30 million in total). It had a dividend paid in common stock for the first two years and earns a $5 per share cumulative dividend, payable if, as, and when declared for subsequent years. In the event of a "fundamental change," holders of Series A preferred stock would have an option to have their shares redeemed by the company at $50 per share, plus accrued dividends. Among events that would constitute a "fundamental change" would be a delisting of Genta stock on the Nasdaq.[6] More important for this case, Genta was contractually obligated to redeem the Series A shares on September 23, 1996 with cash or common stock and, if common stock, to use its best efforts to arrange a public underwriting of the common stock. This obligation, and the

factors which prevented the redemption from occurring, occasioned the long negotiation with the holders of the preferred stock discussed below.

In addition to the foregoing, the preferred had certain governance rights. For example, the holders were entitled to notice of board meetings and were to be given rights to inspect corporate books and visit and observe board meetings.[7]

**C. Chronic Financial Problems:** The lack of a product that generates substantial positive cash flows, coupled with an active research and development agenda, has lead to a notable (later, a somewhat desperate) search for sources of new investment capital. Genta engaged in a series of small equity placements in 1995 and 1996. In December 1995, it placed a $3 million Regulation S offering of Series B convertible preferred stock. In March 1996, it issued $6 million of Series C convertible preferred stock. Finally, on September 17, 1996, it placed a $2 million Regulation S offering of convertible debentures.[8]

By the spring of 1996, it became quite apparent that as of September the company would have insufficient cash to redeem the preferred with cash and, that while common stock would be available, the company's good faith efforts to arrange a firm commitment underwriting of that stock would in all likelihood have no reasonable prospect of success. Genta's board retained Alex. Brown & Sons Incorporated ("Alex.Brown") to advise and assist the company in dealing with its inability to provide either cash or an

---

6. A fundamental change would occur if there were a change in voting power of the company greater than 60%, a merger or transfer of the joint venture, or a substantial reduction of the public market for Genta common stock, as would occur in the event of a delisting from Nasdaq. An occurrence of a fundamental change due to a delisting from Nasdaq became a realistic threat as of December 1996. In the event of a fundamental change, the Series A shareholders would become creditors of the company and could potentially require the company to enter into bankruptcy proceedings.

7. Until early 1995, plaintiff sent observers to Genta board meetings, but then informed Dr. Adams that they no longer wished to participate.

Plaintiff did not indicate a desire to resume this practice until October 1996. By that time, as will be discussed below, the board was involved in discussions which it believed presented a potential conflict of interest with the Series A shareholders, making their attendance inappropriate. In addition, at that time, counsel for the Series A shareholders was unwilling to sign a confidentiality agreement which was apparently required as a condition to receiving financial information.

8. Only 1,424 shares of the Series C preferred stock remain outstanding, the rest of the shares issued in these offerings having been converted into common stock.

assured underwriting of its common stock.[9] In addition, the company asked Alex. Brown to attempt to locate potential sources of equity financing for Genta and to participate in negotiations with SkyePhanna.[10] In June 1996, Genta retained an additional firm, Henson/Montrose, to assist it in locating potential equity investors in Asia.

***D. Series A Committee Organized:*** In July 1996, plaintiff and five other investors holding Series A stock created the Series A Preferred Ad Hoc Committee to act as a bargaining agent with the company. The Committee was intensely interested in getting some return on the Series A and, no doubt, was interested in slowing or stopping the losses that the holders were implicitly realizing as the company continued to lose money.

At the first meeting between the committee and the company (July 1996), Alex. Brown proposed for discussion a three part restructuring. Two elements of that proposal involved the sale of the antisense and JBL businesses.[11] The third part of the proposal involved the sale of a *controlling block* of Genta stock to SkyePharma, in exchange for SkyePharma's interest in the joint venture. Under this proposal, the obligation to the preferred stock would be satisfied and the common stock would continue to have an equity interest in Genta, which would continue to develop the intellectual property in the joint venture.

On August 14, 1996, Genta issued a press release disclosing its difficult cash situation and its search for financing alternatives, including a potential restructuring or an equity investment that would permit it to continue its operations. The press release stated that:

The Company is in discussions with potential corporate partners and other sources regarding collaborative agreements, restructurings and other financing arrangements and is actively seeking additional equity financing ... If such funding is unavailable, the Company will deplete its cash in September 1996 and will be forced to license or sell certain of its assets and technology, scale back or eliminate some or all of its development programs and further reduce its workforce and spending. If such measures are not successfully completed, the Company will be required to discontinue its operations.

On August 19, 1996, the three part restructuring proposal was formally presented to the Series A committee by Alex. Brown. As discussed above, the plan included the sale or spin-off of the two businesses and the SkyePharma proposal, in which the Series A holders would convert their shares into a minority block of Genta's common stock, with SkyePharma becoming Genta's controlling shareholder. The proportionate interest of the pre-existing Genta common stockholders would be severely diluted as a result. The Series A holders did not accept this proposal.

The prospect of bankruptcy thus was discussed. According to a later Alex. Brown report to the Genta board, the Series A committee took the position that the preferred would "wait and see if [Genta would] run out of money and then get [delisted]...." A delisting would give the preferred stock the legal right to the liquidation preference, allowing them to place the company into bankruptcy.

On September 11, Alex. Brown presented a revised, but substantially similar plan to the committee. It stated that Genta's current need for approximately $5.9 million in

---

9. Mark Gineris was placed in charge of Alex. Brown's restructuring efforts.

10. During the summer of 1996, more than six months prior to the disputed transaction, Dr. Rosenwald of Aries was approached by Alex. Brown concerning Genta's search for capital, but no agreement was reached. Dr. Rosenwald was a logical contact due to his past successful investment in Interneuron Pharmaceutical Inc. and his record of investing in financially troubled biopharmaceutical companies.

11. During the spring of 1996, Isis Pharmaceuticals ("Isis") had contacted Genta concerning its interest in acquiring the antisense business for approximately $12 million. Another company, Intergen, had made a proposal to acquire JBL for approximately $4.6 million. Although neither of these proposals had resulted in formal agreements, they formed the framework for Alex. Brown's restructuring plan.

cash would be difficult to meet unless the JBL assets were sold. The Series A shareholders refused to consent to such a sale. They stated that they would approve such a sale only if it were part of a global restructuring solution which would resolve both Genta's cash shortage problem and their desire to get a return on their investment.

During September, a dispute arose with regard to any disposition of the antisense assets as well. Genta (consistent with its management's efforts to allow the common stock to participate in the eventual exploitation of Genta's intellectual property) favored granting a *non-exclusive* license on its antisense business (to Isis). The Series A holders, however, insisted that Genta sell the antisense assets to Isis outright. Ultimately this transaction could not be accomplished.

### E. Genta's Inability to Redeem or Convert Preferred:

In September, Genta gave the Series A holders an option to convert their shares into common stock, but could provide no underwriting in any event. Genta offered to effectuate the conversion or to permit the preferred stock simply to remain outstanding for the time. Due to the low market price of Genta's common stock, (less than $1 per share) an immediate conversion into common stock was not an economically attractive option.[12] Only 10% of the Series A stockholders elected to convert into common stock without an underwriting. The remaining Series A shareholders continued to negotiate with Genta concerning its restructuring proposal.

### F. Multiple Track Investigations:

During October, Alex. Brown continued to work on a restructuring proposal, scheduling a meeting for October 31 to update the Series A committee on its ongoing efforts. During this same period, Dr. Adams began new efforts to seek equity financing for the company.[13] To assist in this search, LBC Capital Resources, Inc., ("LBC") was retained and told that Genta was interested in raising between $10–12 million. Further, Dr. Adams informed LBC that the decision to seek equity financing, while continuing the restructuring negotiations, had the support of a majority of the board, but was opposed by two outside directors and Genta's Chief Financial Officer.[14]

On October 22, 1996, Genta issued another press release concerning its financial position, which like the August press release, stated that Genta was "currently seeking additional capital." LBC solicited interest broadly.[15] Of fifteen companies contacted, five responded. The five were Aries, Susquehanna, Promethian Investment Group, Cambridge Partners, and Loeb Partners. Dr. Adams arranged meetings with the latter three companies for October 31 and November 1.

A meeting with the Series A committee was held contemporaneously on October 31.[16]

---

12. During the six months prior to the challenged transaction, Genta's common stock price remained below $1 per share, sinking as low as $.31 on November 18.

13. On October 11, counsel for the committee sent Dr. Adams a letter asserting the rights of the Series A holders to receive notice and attend board meetings as observers. Despite this letter, the Series A holders did not receive notice or attend any board meetings after August 1996 and were not provided with information given to directors in connection with such meetings, including information concerning other investment avenues being explored by the board.

14. The two outside directors, Mr. Blair and Mr. Colella, and the Chief Financial Officer all resigned by the end of October.

15. LBC never contacted the Series A holders, however. Dr. Adams testified that Genta never

sought an equity investment from the Series A holders, or requested that LBC do so, because he did not believe that they would be willing to invest new capital in the business. Mr. Desai, the principal manager of plaintiff, has testified that he would have been interested in investing more capital in the company, particularly in the form of a $3 million secured loan, in exchange for control of the board, but did not know that it was an option. I accept Mr. Desai's testimony as factual, although, as indicated below, I do not accept that any such offer he might extend could, in the circumstances, be made substantially equivalent to Genta's management which sought for the corporation the best opportunity to develop its technology. *See infra*, at pp. 1057–1059.

16. It is disputed whether the Series A shareholders were asked at this meeting if they were willing to invest further capital in Genta. According to Mr. Hale, he asked the Series A holders whether they would consider investing "any ad-

Alex. Brown presented a different restructuring proposal: Genta would be split into two operating entities, one of which would hold only the joint venture interest. The other would continue the antisense business with funding from a company called Forward Ventures. Genta would retain a minority interest in the new entity holding the antisense assets, with Forward Ventures receiving majority control of this entity in return for its financing commitment.[17] The Series A holders rejected the Forward Ventures proposal, still favoring a sale of all of Genta's antisense assets to Isis in order to create greater liquidity. Genta's board, however, remained opposed to such an asset sale.[18]

Genta's worsening financial situation was widely recognized in the investment community. On November 14, 1996, Genta issued a Form 10–Q stating that:

> The Company will run out of its existing cash resources in December of 1996. Substantial additional sources of financing will be required in order for the Company to continue its planned operations thereafter.... If such funding is unavailable, the Company will be required to consider [various alternatives] ... including, discontinuing its operations, liquidation or seeking protection under the federal bankruptcy laws.

On November 18, Genta's common stock price closed at $.31 per share. As a result, on November 19, Nasdaq announced that Genta's common stock would be delisted unless by December 3 it submitted a plan with respect to how it would comply with Nasdaq's listing requirements concerning net worth. Such a delisting would effectively bring to an end management's efforts to exploit the corporation's intellectual property.

On the LBC front, by the end of November, LBC was only pursuing negotiations with Aries because no other potential investors remained interested.[19] A meeting of representatives from Genta and Aries was scheduled for November 26, 1996. In preparation for the November 26 meeting, Dr. Adams discussed with Mr. Mongiardo of LBC the potential impact of an equity investment on the rights of the Series A stockholders. Adams calculated that up to 60 million shares of common stock could be issued without triggering the "fundamental change" provision in the Series A designations which, if triggered, would obligate the company to repurchase such shares. In addition, prior to the meeting, LBC provided Dr. Rosenwald of Aries with requested information concerning the rights of the Series A holders and the effect that the potential delisting from Nas-

ditional money under any structure that [Genta] could develop." Mr. Hale recalls receiving a negative response to that inquiry. Mr. Desai does not recall this conversation. Whether or not it occurred, there is sufficient evidence to conclude, as I do, that the Series A stockholders were generally opposed to investing additional money in Genta, except marginally to facilitate a plan which they might approve.

17. Defendants point out that both the Forward Ventures proposal and the SkyePharma proposal, involving an acquisition of a 519% interest in Genta, would have involved a change of control transaction.

18. According to the board, an asset sale on the terms offered by Isis presented several problems. First, Isis's refusal to assume certain Genta obligations could result in Genta being sued by third parties for breach of contract. (For example, Genta has a contractual obligation to develop and tender back certain antisense assets to a company called Gen–Probe. Gen–Probe refused to give Genta a waiver of this contractual obli-

gation, and Isis refused to assume it, leaving Genta in a difficult position if it accepted the Isis proposal). Second, Isis was unwilling to assume any of Genta's liabilities, yet demanded a warranty that all of Genta's contracts were in good standing. Genta could not make this warranty because as of October 31, Genta owed Johns Hopkins University, among others, $640,000. In light of these issues, Genta's board was uncertain whether a reasonable deal could be negotiated with Isis, but suggested that the committee attempt to resolve these problems.

19. Henson/Montrose Securities, the other firm engaged by Genta to look for equity investors, was still actively involved in its search for an Asian investor. This search resulted in a potential investment by Nina Wang. Ms. Wang proposed a $15 million investment in Genta in return for majority control of the company. However, due to the slow pace of negotiations, by the end of January 1997, Genta's board apparently believed that a deal with Ms. Wang could not be accomplished quickly enough to solve the company's imminent financial crisis.

daq would have on Genta.[20]

*G. Aries Proposal:* Dr. Rosenwald presented the following financing proposal to Genta at the November 26 meeting. Aries would lend Genta between $5–6 million in exchange for a secured note plus securities consisting of a new class of preferred stock (special preferred stock with embedded alternative rights convertible into common stock at $. 10 per share) and warrants to buy common stock at an exercise price of $. 10 per share. The letter setting forth this proposal stipulated that Aries's immediate control of the Genta board was a non-negotiable term of the proposed transaction.[21]

Adams responded that Genta sought (1) a two tiered financing (i.e., some immediate cash infusion), (2) a higher exercise price on any warrants ($.25 per share) granted in consideration of the second tier financing, and (3) a more limited board presence, permitting Aries to designate only one director and two observers. Two days later, Aries agreed to the two tiered financing structure and a $.20 second tranche exercise price for the warrants. It continued to insist upon a contract right to designate a majority of the board.[22]

*H. December Negotiations:* On December 2, 1996, the Genta board met again to evaluate alternatives. At that meeting, Mr. Gineris of Alex. Brown was included in a discussion concerning the impact that a $6 million investment would have on the value of Genta's common stock if 6 million shares were granted as the consideration.[23] Gineris expressed the view that such a financing would severely dilute the value of the common stock. Following the meeting, Alex. Brown prepared a report analyzing three financing proposals, two of which involved the sale of assets being considered as part of the restructuring plan, and the third involving a sale of 55%, a majority, of Genta's common stock for a $6 million investment. The report concluded that, on the terms assumed, the sale of equity was the least favorable proposal of those considered.[24]

On December 3, the Series A committee made a further proposal to Genta that had three main components. First, Genta would sell JBL, placing all of the proceeds of the sale in escrow for the benefit of, and controlled by, the Series A shareholders. Second, Genta would sell its antisense assets[25], with the main part of the proceeds being paid to the Series A holders, and a portion of the proceeds being reserved for common stock-

---

20.  Plaintiff claims that Aries received inside information which should not have been provided to it by Genta's board. In response, Aries asserts that it was only given the standard information provided to potential equity investors. The information enabled Aries to assess the senior security rights of the Series A shareholders. Whether or not this sharing of information was appropriate, it is undisputed that the same degree of information concerning the Aries proposal was not shared with the Series A holders. Michael Weiss, the Senior Managing Director and General Counsel of Aries, testified that he understood that the Series A holders would not be informed about the Aries proposal.

21.  Aries, which typically makes non-passive investments, has a history of assisting in successful turn arounds of financially troubled bio-pharmaceutical companies.

22.  After further negotiations, discussed below, Aries agreed to a forfeiture of board control in the event that additional second tier financing was not arranged by Aries for Genta. In addition, Aries agreed to an increase in the exercise prices for the first and second tranches to $.15 and $.30 per share respectively.

23.  As a general rule, the Genta board asked Alex. Brown representatives to leave their meetings before the Aries proposal was discussed. Although the $6 million investment analyzed at this meeting was based on the Aries proposal, assuming that a $.10 unit would be issued in consideration, there does not appear to have been any discussion of an outstanding Aries offer or that negotiations with Aries were ongoing. According to Mr. Gineris, he did not believe that the company was seriously considering a sale of the majority of Genta's equity and was not shown the already existing draft letter of intent.

24.  The terms of the final restructuring proposal on the table as of January 28 were quite different than the proposals analyzed by Alex. Brown in this report.

25.  No resolution of the Gen–Probe problem was included in this proposal. Apparently, the Series A committee did not believe that this was a serious obstacle. On December 11, the committee informed Genta that it would "bear the risk and responsibility" with regard to this issue, but did not suggest how it would do so in the event that Genta was sued by a third party.

holders in the event that certain milestones were reached. Third, Genta would sell control over the remainder of Genta to SkyePharma in exchange for $3 million in SkyePharma stock, to be distributed to the Series A holders, and a 29 % interest in the joint venture, of which Genta's common stockholders would receive 20%.[26] Any additional proceeds from the sale of residual assets were earmarked for the Series A holders as well.

Negotiations between Genta and Aries also continued throughout December. During the month, Mr. Mongiardo (I) informed Dr. Adams that Aries intended to continue the antisense business rather than sell it[27], (2) summarized LBC's attempts to find a potential investor, and (3) provided a draft letter, which was later presented to the board, stating a basis to conclude that Genta's value was between $58 and $184 million. In addition, Mr. Mongiardo had discussions with Dr. Adams.

As of December 20, it had become apparent that Genta might be forced into bankruptcy if it did not fairly promptly effectuate one of the transactions on the table. Genta's bankruptcy counsel attended its December 20 board meeting at which the status of Genta's negotiations and the ongoing Nasdaq delisting proceedings were discussed. As expected, on December 21, Nasdaq denied Genta's request for continued listing, but the actual delisting was temporarily suspended until after a formal hearing could be held on January 23.

At this juncture, the Series A preferred stock had expressed their unwillingness to approve the proposed transaction involving Forward Ventures, leaving the Aries deal as the most likely option and one that could not be blocked by the Series A preferred stock.

On December 24, Mr. Rosen, counsel to the Series A committee, wrote Dr. Adams a letter expressing frustration that Genta had not yet accepted the proposal that the preferred stock had put forward. In addition to stating that Dr. Adams was causing Genta to "crash and burn," Mr. Rosen stated that:

> [the] Ad Hoc Committee will continue to try to bring about a resolution. However, if you wish to drive this bus into a canyon, no one can stop you. Just make sure you are alone when it happens.

After Rosen received an update on a December 27 meeting, at which the board analyzed the most recent terms of the restructuring proposal, he again expressed his discontent. Mr. Rosen, obviously unaware that any possibility existed for Genta's board to get the financing necessary to attempt to accomplish its business plan, accused Genta's counsel, Thomas Sparks of Pillsbury Madison & Sutro, of waiting for "sugar plum fairies"[28] and of trying to "prolong the process and plunge Genta into Never Never Land."

On December 30, 1996, the Genta board received a formal presentation of the Aries proposal by Dr. Rosenwald.[29] The board did

---

**26.** On December 11, the committee proposed that the common stockholders receive 24% instead of 20% of the joint venture interest. Each subsequent restructuring proposal, however, gave the common stockholders less consideration. This was due in part to the fact that by late December it became clear that a deal with SkyePharma was unlikely to materialize. In that event, the alternative restructuring proposals being considered would substantially reduce the common stockholders' interest in the joint venture, to 12.5 % or less.

**27.** It appears that Genta's board was particularly concerned about the future fate of its businesses and looked for reassurance from Aries as to this issue.

**28.** Arguably, Mr. Rosen was referring to Genta's ongoing search for an equity investor as an alternative to a restructuring agreement.

**29.** Plaintiff alleges that two of Genta's outside directors were self-interested in the Aries transaction due to events which occurred at the December 30 meeting. First, plaintiff contends that Mr. Hale decided to approve the Aries deal because a $50,000 loan from Genta to him was forgiven at the December 30 board meeting. This loan was forgiven in exchange for the return of Genta shares which Mr. Hale had previously purchased using the loaned funds.

Second, plaintiff alleges that Dr. Ts'o was induced to enter into the Aries transaction by a discussion at the December 30 meeting concerning the use of the proceeds of the Aries deal. Specifically, there were statements made that any restrictions on the use of the proceeds would not apply to debts due to Johns Hopkins, Dr. Ts'o's employer. Although plaintiff contends that this influenced Dr. Ts'o's decision to vote in favor of the transaction one month later, it appears that Dr. Ts'o recognized that any of the

not formally act at that time with respect to the proposal.

*I. January 1997:* Aries began performing due diligence activities in January, relying on statements that Genta intended to enter into a financing deal with Aries. The Genta board, however, continued analyzing its other options. On January 9, 1997, the Series A committee made its last proposal prior to the challenged transaction. By that date, it had become clear that the SkyePharma deal was unlikely to occur, and that proceeds from the sale of JBL would be insufficient to satisfy Genta's cash requirements. Thus, as part of this final proposal, the committee suggested that a portion of the Isis stock, which the Series A had proposed that they receive in a sale of the antisense assets, could be sold to take care of the cash shortage. In order to compensate the Series A holders for this loss of consideration, their final proposal contained a diminution in the common stockholder's percentage of the joint venture. If, as suggested, $1.5 million worth of Isis stock were sold, the common stockholders would not be entitled to any percentage of the remaining joint venture interest pursuant to the formula proposed by the committee.[30] In addition to these proposals, the committee recommended that Genta initiate a prepackaged Chapter 11 bankruptcy.

On January 13, 1997, the Genta board met. It analyzed the most recent Series A proposal and the Aries and Wang proposals, as well as the consequences of a bankruptcy option. In the event of bankruptcy, the board concluded that the common stockholders would be likely to get no return on their investment. If the terms of the latest restructuring proposal were accepted, it was also likely that the common stockholders would receive zero value, based on calculations presented by Alex. Brown.

After the board meeting, Alex. Brown's Mr. Gineris sent Mr. Rosen a table reflecting his analysis. Gineris circled what in his judgment were the most likely scenarios on the table and wrote in comments reflecting his concern that such scenarios were "too punitive" to the common stock and would be unlikely to get stockholder approval.[31] The Series A committee offered no amendment to the terms of their January 9 proposal. Instead, Mr. Rosen indicated that the committee intended to "stand pat." Later that day, Mr. Gineris informed the board that the committee had opted to "stand pat with no further discussions," and that they were "willing to take the consequences of that."

Negotiations with Ms. Wang and Aries were still ongoing throughout this period. On January 21, 1997, Genta's board members received several documents concerning the Aries deal to assist them in determining whether to approve that transaction. The packet of information distributed by Dr. Adams included the December 18 letter detailing LBC's efforts to find an equity investor, a two page letter from LBC concluding that the Aries deal was "fairer" than the restructuring proposal[32], a two page letter from Dr. Adams comparing the two proposals,[33] and a stock information table. Board meetings were scheduled for January 26 and 28 to discuss these proposals.

---

alternative transactions would have enabled Genta to pay off the debts. Like Mr. Hale, Dr. Ts'o tended to favor a deal with Ms. Wang prior to January 28, but it never materialized into a firm offer.

**30.** In the event that a deal with SkyePharma became possible, the common stockholders would receive an 11 % joint venture interest.

**31.** The preferred's proposal would likely require stockholder approval under Section 271 of DGCL.

**32.** Realizing that LBC was still unwilling, or unable due to lack of experience in this area, to prepare a formal fairness opinion regarding the Aries transaction, Dr. Adams requested that LBC prepare an informal letter comparing the alternative deals being presented to the board. De-

fendants allege that Genta had neither the time nor the money (an estimated $250,000) to procure a formal fairness opinion from another source at this time.

**33.** Plaintiff alleges that Dr. Adams' analysis was fundamentally flawed. First, plaintiff alleges that Dr. Adams used a significantly different value for the antisense business in comparing the restructuring and Aries proposals. Whereas the antisense business was given no value in the restructuring calculation, because of an assumption that all of the consideration from a sale of this business would be paid to Series A shareholders due to their liquidation preference, the same business was given a present value of $59 million in the Aries deal valuation. Second, Dr. Adams apparently incorrectly overstated the per stockholder value of the Aries transaction due to

On January 23, Genta and an Aries representative participated in the anticipated Nasdaq delisting hearing. As a result of the hearing, Nasdaq decided again to postpone the threatened delisting of Genta's stock. Genta was, however, informed that it would be delisted in the future unless it increased its net tangible assets and met other requirements.[34]

As of the January 26 meeting, it had become clear that Genta had to complete a financing transaction rapidly, or else face bankruptcy. Recognizing that Genta would not have sufficient cash for its payroll due on February 1, Genta's bankruptcy lawyers had begun preparing the necessary papers to file for bankruptcy on January 29. At this juncture, faced with an imminent decision, Dr. Adams informed the board that he opposed the restructuring proposal in its present form.[35] Further, Dr. Adams reported to the board that he had told Mr. Gineris that the current Series A proposal was unacceptable.[36]

The Aries offer was set to expire as of January 28; the board had received no further restructuring proposals from the Series A committee; no firm offer from Ms. Wang was on the horizon; and bankruptcy was imminent. In this context, during the January 28 meeting, the board again reviewed the terms of each of the proposals before it made a decision concerning Genta's future.

*J. Aries Transaction:* On January 28, 1997, the Genta board unanimously approved the Aries transaction.[37] According to plaintiff, the members of the Series A committee and Alex. Brown learned of this transaction for the first time when they read a press release disclosing the transaction on the following day.

Pursuant to a January 28 letter of intent, Genta and Aries agreed to enter into a two step financing on the following terms. The first step, which by the time of trial of this case had already occurred, involved Aries loaning Genta $3 million in cash.[38] In ex-

---

a mathematical error concerning the numbers of shares of common stock that would be outstanding following the Aries transaction. Only Dr. Adams recalls that the Genta directors discussed this error at a board meeting before approving the transaction.

**34.** On February 4, 1997, after the challenged Aries transaction had already been entered into and announced, Genta was removed from the Nasdaq National Market and was instead listed on the Nasdaq SmallCap Market. At that time, Genta was informed that it would be removed from the SmallCap listing as well unless it increased its net tangible assets by April 7, 1997.

**35.** Director Klem had concluded as well that the final Series A proposal was unacceptable, identifying five key problems: the impact on the common stockholders, the plan to escrow the JBL proceeds in a manner which could enable the Series A holders to force Genta into bankruptcy, the remaining Gen–Probe issue, the fact that it would be unfair to give an estimated $85 million in value (on his assumption about values based on the data supplied by LBC) to the Series A holders while the common received zero value, and the failure to resolve the threat of a future Nasdaq delisting. In his opinion, the Aries proposal would give the common stockholders between $1 to $2 in value per share.

**36.** Although Dr. Adams recalls making similar remarks to Skip Klein of T. Rowe Price, a member of the Series A committee, and informing

him that Genta was considering alternative transactions, plaintiff claims that it, and other members of the Series A committee, had no knowledge of this conversation or that other transactions were being considered at this point. However, there is some additional testimony to the contrary. According to Aries, Sven Borho of Mehta & Isaly, a Series A advisor, contacted Joseph Edelman of Aries in January to advise Aries not to go forward with the Genta financing transaction.

**37.** Dr. Adams has explained that he believed that the Aries transaction had "the best chance of providing value to all of [Genta's] shareholders." By entering into this deal with an experienced bio-pharmaceutical company investor familiar with the antisense and drug delivery fields, Dr. Adams predicted that "the transaction [would preserve] a very large percentage of the upside for the existing common stockholders and ... [assure] the Series A that eventually they will be able to be taken out in an underwritten take out, which [would] ... allow them to recover their investment." The board estimated that the Aries proposal, although dilutive, would leave the common stockholders with 36% of the equity value of Genta. At most, the board believed that the common stockholders would have been left with a 10% interest under a restructuring proposal.

**38.** $250,000 was paid on January 29, 1997, with the remaining $2.75 million paid at closing on February 13, 1997.

change, Aries received convertible secured bridge notes with a $3 million face value,[39] 7.8 million Class A warrants with a $.001 per share exercise price, and 12.2 million Class B warrants with a per share exercise price of $.55.[40] The bridge notes are immediately convertible into 600,000 shares of Series D convertible preferred stock with a $10 stated value per share.[41] In the event that Aries converts this preferred stock, Aries would receive 20 million shares of Genta common stock. Together the transaction offers Aries the right to acquire 40 million shares of Genta common stock—a controlling interest in the company.[42]

In addition to this consideration in the form of debt and equity, Aries received an immediate contractual right to require the Genta board to cause a sufficient number of its designees to be added to the board so as to constitute a majority of the board.[43] In the event that Aries does not satisfy its future obligations to raise additional capital (the second tier financing), however, this right will terminate. That is, pursuant to the terms of the second tranche of this financing, Aries has agreed to use its "best efforts" to arrange between $2.5 to $12 million in additional financing for Genta.[44] If, within six months following the effective date of the agreement, Aries has not located at least $3.5

million of additional financing for the company, it will lose its right to designate a majority of the board. The agreement does not state the minimum terms upon which an acceptable financing can be made in order to satisfy Aries's obligation, but requires board approval and permits Genta to opt for alternative financing if it is available on preferable terms.

In addition to the financial terms of the deal, Aries represented to Genta that it did not intend to liquidate the company and would use its best efforts to continue Genta's antisense business. Aries did not make any representations or side agreements concerning the continued employment of Dr. Adams or other Genta board members. To the contrary, the testimony is that Dr. Adams told Aries that it should consider hiring a new CEO.

**K. Equity-Linked's March 3 Proposal:** Immediately prior to the hearing in this action, Equity Linked delivered a proposal to Genta that offered to extend a $3.6 million loan to Genta on the same terms as those reflected in the Aries transaction.[45] This offer appears to have been an attempt by plaintiff to demonstrate that it would have been willing to do the same deal on terms at least as favorable as those offered by Aries.[46]

---

**39.** As security for the notes, Genta granted Aries a first lien on all of Genta's lienable assets.

**40.** Both the A and B warrants are immediately exercisable and have a term of five years. The effective average price of these warrants is actually $.15 per share of common stock, not $.25. I conclude this because, pursuant to the financing agreement, the failure of Genta's stockholders to approve the transaction would constitute an event of default, entitling Aries to convert up to $300,000 of its secured debt into three hundred million shares of Genta common stock (or in that event 90% of the common). In effect, this coercive default provision guarantees stockholder approval, which may be required under Nasdaq listing standards. Once the Aries deal has received stockholder approval, or there has been a decision that such approval is not required, all of the warrants can be exchanged for new warrants with the same terms, but convertible at $.15 per share.

**41.** The initial conversion price for such notes is $5 per share. The Series D preferred stock is then convertible into common stock at $.15 per share.

**42.** At that time, there would be 79.9 million shares of Genta common stock outstanding.

**43.** Aries has not exercised this right yet, and has indicated that it does not intend to do so while this litigation is pending.

**44.** Specifically, Aries agreed to use its "best efforts" to effect the purchase of a minimum of 25 up to a maximum of 75 "units," which will be sold at $100,000 per unit. Such units will have three components, including $70,000 of senior secured convertible notes, 3,000 shares of preferred stock, and 333,334 warrants. The notes and warrants will both have an exercise price of at least $.30 per share of common stock.

**45.** The Aries financing agreement provides for a $100,000 break-up fee to be paid if Genta prevents the financing from occurring or breaches the agreement in some other manner.

**46.** There is some dispute as to whether the additional $600,000 would make this proposal more dilutive to the common stock than the Aries proposal, but that issue is not particularly rele-

## II.

The broad question is whether the foregoing facts constitute a breach of duty by the directors of Genta. The theory of the original complaint was that the Aries transaction represented a bad faith exercise of corporate power; that the purpose of the transaction was simply to protect the employment of the incumbent officers; and that a sweetheart deal with Dr. Rosenwald's entity was arranged in order to do that. Indeed, the discovery here showed that Rosenwald was very much an arm's length negotiator and that there was no comfort offered to (or sought by) existing management. Rather, the evidence tends to show that the majority of the Genta board was motivated by a desire to see the enterprise finally pay-off by developing or participating in a portion of the development of some of its intellectual properties.

In all events, at trial, plaintiff's theory was no longer that the transaction represented an effort to protect management. The legal theory that plaintiff advanced at trial does not really acknowledge the true nature of the financial conflict at the heart of the matter. Rather, plaintiff's trial theory acts as if plaintiff were simply like any other holder of *common stock* and sought a corrective order so that a higher price for the common could be achieved in a sale.

The claim now is that the board "transferred control" of the company and that in such a transaction it is necessary that the board act reasonably to get the highest price, which this board did not do. Plaintiff urges that the special duty recognized in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986), arose here because (1) Aries has a contract right to designate a majority of the Genta board and (2) Aries acquired warrants that if exercised would give it the power to control any election of the Genta board. Thus, this transaction is seen as similar to the noted case of *Paramount Communications Inc. v. QVC*

*Network Inc.*, Del.Supr., 637 A.2d 34 (1993). Plaintiff claims that the board hid the fact that control might be for sale, instead of announcing it and creating price competition respecting it. In support of the assertion that the board could have done better for common stockholders, like themselves, plaintiff points to the litigation produced alternative proposal of the Series A preferred stock. The idea is that this alternative is financially a little better and that if the directors would have met their "Revlon duty" then, this or another better alternative would have come to light. In this way, plaintiff claims the interests of all holders of equity securities would have been better off because Genta would have gotten greater value.

* * *

Based upon a preponderance of the admissible, credible testimony, it is my opinion, for the reasons set forth in this opinion, that the Genta board fully satisfied its obligations of good faith and attention with respect to the Aries transaction. The directors of Genta did not, therefore, breach a fiduciary duty owed to the corporation or any of its equity security holders. I conclude that with respect to this transaction, the board was independent; it was motivated throughout by a good faith attempt to maximize long-term corporate value; and that the board and senior management were appropriately informed of alternatives available *to implement the business plan that the directors sought to achieve.* Moreover, if reviewed under a reasonableness criterion, I conclude that the board acted in an entirely reasonable way to achieve its goal and that its goal, although obviously one that reasonable minds could disagree about—was not one that was impermissible.

### A.

**"Revlon Duties" and a Change in Corporate Control:** In *Paramount Communications, Inc. v. QVC Network Inc.*, the Delaware Supreme Court considered a series of

---

vant at this juncture. Even if the two proposals had identical terms, there would arguably be substantial differences between the two proposals, given the expertise of Aries in turning around distressed bi-pharmaceutical companies and the

differing incentives of the two parties which could affect whether they chose to continue the businesses or liquidate the company after gaining board control.

cases dealing with the fiduciary duties of corporate directors when directors authorize a transaction that has the effect of changing corporate control. The most prominent of these was the 1986 opinion in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* That case had been widely thought to announce special directorial duties in the event of a "sale" of the corporation. The specific character of that rule however was not entirely clear, but it was generally taken to be that in certain circumstances (loosely a "sale" of the company) directors must maximize the current value of the corporation's stock; they may not exercise a judgment to choose less when more is offered.[47] But this broad generalization masks more questions than it answers. In fact the meaning of *Revlon*—specifically, when its special duties were triggered, and what those duties specifically required—were questions that repeatedly troubled the bench and the bar in the turbulent wake of the *Revlon* decision. Reasonable minds differed. One view of the holding in *Revlon* was that it was premised on a duty (the duty to auction the company when it was for sale, or, less woodenly, the duty to get the best price, or the duty not to discriminate between bidders) that *was different in some way from the ordinary director duties:* to act in good faith pursuit of corporate welfare and to be informed and attentive. On this view, once a "sale" of the corporation was in contemplation, "Revlon duties" would be thought to limit the range of good faith business judgment that the board might make (e.g., board must conduct an auction; or no "lock-up" agreements allowed; or no "favoritism" among bidders; etc.), and afforded a reviewing court additional (fairness) grounds in any judicial review of director action. This interpretation of "Revlon duties" was early on taken up by academic commentators and plaintiffs' attorneys and continued to resonate in some of the opinions throughout the period. *See, e.g., Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261 (1989).

Other cases tended to "normalize" directors' duties in these important transactions; they reflect greater deference to an independent board even in a "sale" context, and acknowledged the necessity of an independent board to make business judgments even in that setting. Thus, these cases tended to evaluate board conduct, even in that context, in terms of the board's steps to be informed and its good faith. *See, e.g., In re RJR Nabisco, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 10389, Allen, C. (Jan. 31, 1989), Slip Op., 1989 WL 7036, (1989). Under this more business-judgment like view, the board continued to possess substantial discretion with respect to conducting a sale. So long as it satisfied a burden to show compliance with its basic duties—independence, good faith and due attentiveness—the board's judgments would be respected. *See, e.g., In re J.P. Stevens & Co., Shareholders Litig.,* Del. Ch., 542 A.2d 770 (1988)(upholding the grant of inducements to one bidder during an active auction); *Barkan v. Amsted Indus., Inc.,* Del.Supr., 567 A.2d 1279 (1989)(no single template for "selling a company"). In this view "Revlon duties" changed things only by shifting burden of proof and persuasion and by focusing attention on present shareholder value, but it did not fundamentally interfere with the freedom of directors to make good faith business judgment.

■ This existing uncertainty respecting the meaning of "Revlon duties" was substantially dissipated by the Delaware Supreme Court's opinion in *Paramount.* The case teaches a great deal, but it may be said to support these generalizations at least: (1) where a transaction constituted a "change in corporate control", such that the shareholders would thereafter lose a further opportunity to participate in a change of control premium, (2) the board's duty of loyalty requires it to try in good faith to get the best price reasonably available (which specifically means that the board must at least discuss an interest expressed by any financially capable buyer), and (3) in such context courts will employ an (objective) "reasonableness" stan-

---

**47.** The germinal principle is the fundamental one that a fiduciary may not sell an asset for less cash when more cash is available and no circumstance affecting the trust or its beneficiary justi-

fies choosing less. *See Robinson v. Pittsburgh Oil Refining Corp.,* Del. Ch., 126 A. 46 (1926); *see also Wilmington Trust Co. v. Coulter,* Del.Supr., 200 A.2d 441 (1964).

dard of review (both to the process and the result!) to evaluate whether the directors have complied with their fundamental duties of care and good faith (loyalty). Thus, *Paramount* in effect mediates between the "normalizing" tendency of some prior cases and the more highly regulatory approach of others. It adopts an *intermediate level of judicial review* which recognizes the broad power of the board to make decisions in the process of negotiating and recommending a "sale of control" transaction, so long as the board is informed, motivated by good faith desire to achieve the best available transaction, and proceeds "reasonably"

■ With respect to the important question of *when these duties are enhanced*—specifically, the duty to try in good faith to maximize current share value and the duty to reasonably explore all options (i.e., to talk with all financially responsible parties)—the court's teaching ironically narrowed the range of Revlon duties, but did not make its application necessarily clearer.[48] It narrowed the range of corporate transactions to which the principle of Revlon applies. That is, it explicitly recognized that where a stock for stock merger is involved, the business judgment of the board, concerning the quality and prospects of the stock the shareholders would receive in the merger, would be reviewed deferentially, as in other settings. *See In re Santa Fe Pacific Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59 (1995). The holding of *Paramount*, however, was that where the stock to be received in the merger was the stock of a corporation under the control of a single individual or a control group, then the transaction should be treated for "Revlon duty" purposes as a cash merger would be treated: there is no tomorrow for the shareholders (no assured long-term), the board's obligation is to make a good faith, informed judgment to maximize current share value, and the court reviews such determinations on a "reasonableness" basis, which otherwise they would not do. How this "change in control" trigger works in instances of mixed cash and stock or other paper awaits future cases.

## B.

**Application of *Paramount* to the Aries Transaction:** The questions that *Paramount* frames for this case are essentially two. First, is the Aries transaction a "change in corporate control" that triggers special directorial duties and that requires enhanced judicial review, under a reasonableness standard. Second, if it is, do the facts found, set forth above, constitute either (1) bad faith or insufficiently informed action or (2) unreasonable action given the type of transaction that was under consideration.

**1. Does the Aries transaction trigger special board duties?** I assume for purposes of deciding this case, without deciding, that the granting of immediately exercisable warrants, which, if exercised, would give the holder voting control of the corporation, is a transaction of the type that warrants the imposition of the special duties and special review standard of *Paramount*.

**2. What are the special duties that are triggered?** The duties that devolve upon the board when it approves a transaction having a change in corporate control effect (and here I mean specifically, as in *Paramount*, where corporate action plays a necessary part in the formation of a control block where one did not previously exist), is to take *special efforts to be well informed* of alternatives, and to approve only a transaction that seeks *reasonably* to maximize the *current value of the corporation's equity*. That is the gist of the Revlon state: to act reasonably to maximize current, not some future, value. (In other states, it is entirely up to the board to exercise judgment over what time-frame the corporation's resources are to be developed and how. *See Paramount Communications, Inc. v. Time Inc.*, Del. Supr., 571 A.2d 1140 (1989)).

The enhanced information obligation, occasioned by the gravity of the triggering transaction, may be satisfied through an auction, through a "market check," or perhaps in other ways, but it is fundamental that the

**48.** This unclarity, one should be quick to note is to a large extent inherent in *ex post* fiduciary review and there is good reason to suppose it can be efficient.

board's effort to be informed must be active and reasonable.

**3. Have the director-defendants failed to reasonably attempt to advance the current interests (or value) of the holders of the corporation's equity securities?** The board did not negotiate with the preferred stock with respect to a transaction of the kind it was attempting to find elsewhere. Thus the question: Did this violate the board's duty to be especially active and reasonable in searching for relevant information? Secondly, assuming, without deciding, that the March 3 proposal by the preferred stock was on better terms than the Rosenwald/Aries deal—in that it offered a somewhat greater first tranche credit—has the board failed reasonably to maximize the current ·value of the firm's equity?

In my opinion, the answer to both of these questions is no.

**With respect to the first question,** even though no offer was made to the preferred to permit them to acquire control, I cannot conclude that the board was not fully informed of the company's relevant alternatives (i.e., relevant to the board's good faith business plan) by the time it authorized the Aries transaction. The ultimate choice for the board was correctly understood. It was not between the Aries transaction and an alternative similar transaction at a "higher price" or on better terms, of which the board did not know because of its inattention (or otherwise). The real choice was between (1) a transaction that attempted to finance a future for the company in which products might be developed and brought to market, and (2) a transaction that treated the enterprise (perhaps correctly) as a failed effort and would therefore involve the sale of its assets and a distribution of the proceeds, largely if not entirely, to the preferred stock.[49] After a lot of effort the board saw this choice as the choice between accepting the Aries transaction, on one hand, which offered some prospect of further credit being raised, some bio-tech expertise being brought

to bear by the investor, and some meaningful enhancement of the prospects of the company for survival, product development, and ultimate financial success, and, on the other hand, accepting the final, take it or leave it proposal of the Series A preferred stock, which meant that the common would get essentially nothing and the corporation would never see the future benefit of the exploitation of its intellectual property.

The charge of failure to search appropriately for alternatives that would have been more beneficial to the owners of the company's equity securities is deeply unconvincing on the evidence. The evidence is completely inconsistent with the notion that some other (third) party, who was unknown, would have offered a better deal to Genta. The board, with the advice and assistance of professional advisors, had thoroughly explored that possibility. The more plausible supposition is that if the board had gone back to the Series A preferred stock once its deal with Aries was substantially negotiated, the preferred would likely have authorized a proposal like the one that the holders ultimately put forth in the litigation, which I will assume is in certain respects superior. Nevertheless, I conclude that the board's failure to afford the preferred stock an opportunity to meet or exceed the Aries proposal was quite reasonable in the circumstances (some reasonable minds may have thought it likely to be futile and wasteful).

The Genta board had been dealing with the preferred stock for some time in a rather intense way. The board knew, or had good reason to believe it knew, what *were* the business goals of the preferred with respect to its investment in Genta. The preferred quite certainly were interested in taking as much money out of Genta as possible, as soon as possible.

The various negotiations concerning the antisense business reflect one clear example of this. Management wanted to discuss an assignment of the intellectual property that

---

**49.** It is not part of the court's responsibility to evaluate which course of action was wiser from . the point of view of the convertible preferred or the common. I would have to accept the notion that the holders of the preferred stock are in the

only position to say with authority what is in their best interest. Equally clearly, the common had an adverse interest to the preferred if the preferred didn't want (as they apparently did not want) to role the dice on the future.

the company possessed, but wanted to grant a non-exclusive license, so that the company itself, if it could find financing, could continue its research and development efforts. The Series A committee was unyielding. Any such step would limit the amount of cash that might be generated for distribution and, thus, was opposed.

Moreover, the Series A knew that management was looking for financing. There were press releases to that effect. Yet they were unwilling to put in more money. The preferred is of course not to be criticized for that. They have every right to send no good dollars after bad ones. Indeed, they had the right to withhold necessary consents to salvage plans unless their demands were satisfied. But when plaintiff now contends that the Genta board was required by fiduciary duty to the company's common stockholders to go back to the Series A preferred after finding an investor willing to do what the Series A sought to prevent, I cannot agree. Delaware law cannot sensibly criticize the Genta board of directors for recognizing the practical reality with which they were faced and acting on their permissible vision of their duty.

It was quite reasonable for the Genta board to conclude that, if the policy of the board was to try to find a way to finance further research and development in order to attempt to benefit the residual owners of the firm, that any proposal that transferred corporate control or potential control to the preferred stock was a highly dubious way to achieve *that goal.*

**Why a *Revlon* auction or other bidding with the preferred participating would not maximize value of the common stock in the situation faced by Genta's board:** A bidding contest between the Series A and a new investor interested in developing Genta's intellectual property would be a poor way to attempt to maximize either the present value or some future value of the common stock in these particular circumstances, I assume, as the facts allow, that the Series A liquidation premium is greater than the liquidation value of the firm—but that the preferred stock has no legal right to force a liquidation. In that event, the preferred would have a bidding

advantage and would use it to *deprive the common of their power to exploit the preferred that the common currently possesses.* Assume, for example, that the present value of the firm's prospects as a going concern would be only $9 million (net), which is also its liquidation value. Assume that in an open bidding contest, a well informed bidder will offer *the company* something less than 3 million for a 51% interest (i.e., $9mm + $3mm = $12mm divided by 2 = $6mm; but since in liquidation the common stock would be worthless, the bidder would be unlikely to bid the maximum $6mm value on these assumptions). Assume such a $3mm bid would permit the common stock some further opportunity to see a payoff in the company labs and in the marketplace. Now assume that a bidding contest occurs in which the preferred takes part. What will probably happen? The preferred's aim might be simply to liquidate the company and take all of the net proceeds and apply it to its preference. This will prevent its exploitation by the common and cut its losses. To accomplish that goal, the preferred could easily pay in an auction up to $21 million ($30 million liquidation preference minus present net liquidation value) because that amount would go into the company's treasury but could be immediately restored to the preferred when it exercised its voting power to cause the liquidation of the firm.

To generalize, the existence of a "below water" liquidation preference would allow the preferred to out bid an arm's length bidder for Genta's assets and defeat an attempt to exploit the company's properties (and not incidentally, an attempt to exploit the preferred in its current situation) for the benefit of the common stock. What the board did, in effect, was to try on behalf of the common to exploit the preferred—by imposing risks on them without proportionate opportunity for rewards. That the preferred is open to this risk legally, is a function of the terms of its security. I think it is perfectly permissible for the board to choose this course in these circumstances. To engage in a *Revlon* auction or otherwise allow the preferred to out bid a third party, would be to defeat this legitimate strategy.

While Aries does not offer complete assurance that it will be able to deliver on the board's long-term vision, its economic incentives are more aligned with its doing so than would be those of the holders of the Series A preferred stock. Aries would not have the conflict with the common that is created by the contractual right of the preferred to a liquidation preference. Thus, its incentives to achieve long-term value creation would be stronger.

**With respect to the second question,** if we assume that Genta's board was operating under the unusual gravitational pulls of planet Revlon, we must acknowledge that the board is supposed in such "sale of control" circumstances, to have the single aim of maximizing the present value of the firm's equity. That requirement is very clear when, for example, one bidder, offers an all cash deal and another offers all cash as well, but less money. It is tolerably clear when one bidder offers cash and another offers cash and widely traded securities, the package being worth less when measured by dependable markets. But what that requirement means in this setting, where (1) the transaction is not a merger or tender offer with a "price" per share at all, and (2) the transaction (or alternatives now advanced) are not otherwise easily reduced to a present value calculation, is not obvious. What *is* clear is that the Genta board was striving to maximize the possibility of the common stock participating in some "upside" benefit from the commercial development of the company's intellectual properties. It is clear too that the course it took to do that arguably was superior to an alternative in which the preferred acquired control, because the preferred had a financial incentive to liquidate the firm immediately, thus depriving the common of any current value.

Thus, unlike two competing cash transactions or transaction in which widely traded securities are offered, the alternatives that plaintiff poses are rich with legitimate, indeed unavoidable, occasions for the exercise of good faith business judgment. Where judgment is inescapably required, all that the law may sensibly ask of corporate directors is that they exercise independent, good faith and attentive judgment, both with respect to the quantum of information necessary or appropriate in the circumstances and with respect to the substantive decision to be made.

This principle has application here. The Genta board had a business goal of trying to maintain an equity participation for the common stock in its promising intellectual properties. It mattered to this strategy who was the controlling shareholder. While the Genta board hardly could (or at all events did not) negotiate binding provisions assuring that its goal would be obtained, it could and did exercise an informed good faith judgment concerning it. It took steps demonstrating its good faith efforts. First, it negotiated with Dr. Rosenwald for the second tranche of financing. Second, it received an undertaking from Dr. Rosenwald that he did not intend to liquidate the company and would try to develop the antisense business. Third, the economic incentives of Aries were inherently different than those of the Series A preferred stock and the board could recognize and depend to some extent on those differences. That is, the Series A inherently have some interest in protecting their liquidation preference. Aries, like other owners of only common, has an incentive to employ the remaining capital and that which can be raised, to commercially exploit Genta's properties.

Moreover, Aries did not simply offer money in exchange for potential control of Genta. It offered as well a good faith effort to raise additional financing and it offered a principal with considerable experience and expertise on the financing and operation of bio-technology firms. Even if one were to believe that the preferred stock's offer that came before trial should be accepted as a *bona fide* alternative to reach the company's long-term goal, there would be sufficient substantive differences between Aries's proposal and the only alternative that might have been available, to permit the judgment of the independent board to stand.

In short, the facts of this case clearly do not look like a situation in which, from the common stock's perspective, "there is no tomorrow," and the board ought not be recognized as having discretion to prefer what it sees as a "longer term value" over a higher

present value. The court would have no basis to conclude that the immediate value of the common would in fact be greater had an alternative of the kind presented by the preferred somehow been put in place in January.

Thus, I conclude in the circumstances disclosed by the balance of the credible evidence, that the Genta board concluded in good faith that the corporation's interests were best served by a transaction that it thought would maximize potential long-run wealth creation and that in the circumstances, including the potential insolvency of the company and the presence of a $30 million liquidation preference, the board acted reasonably in pursuit of the highest achievable *present* value of the Genta common stock, by proceeding as it did.

Judgment will be granted for defendants and against plaintiff. Each party to bear its own costs.