137 F.Supp.2d 502 (2001)
OFFICIAL COMMITTEE OF THE UNSECURED CREDITORS OF COLOR TILE, INC., Plaintiff,
v.
INVESTCORP S.A., Investcorp International Inc., CIP Limited, Corporate Equity Limited, Acquisition Equity Limited, Funding Equity Limited, Planning Equity Limited, Elias N. Hallak, Nemir A. Kirdar, Michael L. Merritt, Paul W. Soldatos, Jon P. Hedley, Charles J. Philippin, E. Garrett Bewkes, III, Walter F. Loeb, Coopers & Lybrand, L.L.P., Investcorp Bank, E.C., ABF Acquisition Corp., Investcorp Holdings Limited, Window Investments Limited, Shades International Limited, Shades Investments Limited, Blinds Equity Limited, Blinds Holdings Limited, AIBC Investcorp Finance B.V., Investcorp Investment Holdings Limited, Acquisition Capital Limited, Corporate Capital Limited, Funding Capital Limited, and Planning Capital Limited, Defendants.
No. 97 CIV. 9261(MGC).
United States District Court, S.D. New York.
April 20, 2001.
*503 *504 Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY, By Peter M. Fishbein, Jane W. Parver, Michael A. Lynn, for Plaintiff.
Dewey Ballantine LLP, New York, NY, By Harvey Kurzweil, Joanna R. Swomley, John F. Collins, Lawrence Brocchini, Edith L. Josephson, for Moving Defendants.
Kelley Drye & Warren LLP, New York, NY, By Sarah L. Reid, Co-counsel for Defendant Walter F. Loeb.

OPINION
CEDARBAUM, District Judge.
Official Committee of the Unsecured Creditors of Color Tile, Inc. sues eight individuals and twenty-three legal entities on 19 grounds. I dismissed ten of the claims (8-18) and four of the defendants (Coopers and Lybrand, LLP, Hedley, Philippin, and Bewkes) at earlier stages of the *505 case. Official Committee of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A., et al., 80 F.Supp.2d 129 (S.D.N.Y. 1999) (dismissing Claims 13-18); Official Committee of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A., et al., 1999 WL 754015 (S.D.N.Y. Sept.24, 1999) (dismissing Claims 8-12). Defendants have now filed motions for summary judgment seeking the dismissal of all remaining claims. At oral argument, I granted Loeb's motion with respect to Claim Two (alleging that Loeb violated his duty of loyalty to Color Tile), and reserved decision on the remaining motions. See Transcript, December 14, 2000, at 43-44, 99. For the reasons that follow, the motion for summary judgment with respect to Claims One through Five is now granted. Defendants' motion for summary judgment on Claims Six and Seven is denied. Defendants' motion for summary judgment with respect to Claim Nineteen is held in abeyance pending further submissions by the parties.

BACKGROUND
"The Investcorp Group" comprises a number of related companies and affiliates which act together as principals and intermediaries in a variety of international investment transactions on behalf of themselves and their investors. Investcorp S.A. ("SA"), Investcorp International Inc. ("III"),[1] Investcorp Bank, E.C. ("EC"), and various Cayman Island holding companies are some of the companies affiliated with the Investcorp Group.
In 1989, III recommended Color Tile as a potentially attractive investment. In order to facilitate the acquisition of Color Tile, affiliates of EC formed a holding company called Color Tile Holdings, Inc. ("CT Holdings"). CT Holdings acquired all of Color Tile's common stock. Various employees, including Color Tile management, owned Class C ("non-voting") shares in CT Holdings, amounting to an 8% equity stake in the company. A number of affiliated companies owned all of the Class D ("voting") shares in CT Holdings. The voting shareholders fell into two categories: 1) four Cayman Island companies which collectively owned 20% of CT Holdings' equity and 28% of the voting stock: Corporate Equity Limited ("CEL"), Acquisition Equity Limited ("AEL"), Funding Equity Limited ("FEL"), and Planning Equity Limited ("PEL"); and 2) three "Tile" companies which collectively owned 72% of CT Holdings' equity and each of which owned 24% of the voting stock: Tile Capital Limited, 99% of the stock of which was owned by Elias N. Hallak, the co-COO of SA; Tile International Limited, 99% of the stock of which was owned by Michael L. Merritt, the co-COO of SA; and Tile Equity Limited, 99% of the stock of which was owned by Nemir A. Kirdar, the President and CEO of SA.[2]
In 1993, American Blind Factory ("ABF"), a family-run private company that sold blinds and wallpaper through direct-response marketing and retail stores, was offered for sale. Donaldson, Lufkin and Jenrette ("DLJ"), retained by ABF to assist with the sale, contacted Color Tile as a potential strategic buyer. There were five written offers for ABF, ranging from $68 million to $96 million. On behalf of Color Tile, III submitted an all-cash bid of $85 million,[3] subject to due diligence. This bid was accepted.
*506 In September 1993, after the completion of some due diligence, the Color Tile board met formally and discussed the potential acquisition of ABF. At this time, Color Tile's board consisted of five members: Daniel Gilmartin (CFO); Eddie Lesok (CEO); Larry Nagle (President); Walter Loeb (an outside director formerly retained by III as an independent consultant); and Paul Soldatos (director and officer of III).
In October 1993, Color Tile filed a Registration Statement on Form S-1 in connection with a proposed offering of $200 million in Senior Notes; first and second amendments to this registration statement were filed in November and December 1993, respectively. On December 10, 1993, Color Tile issued a Prospectus in connection with its proposed offering of Senior Notes.
Color Tile did not acquire ABF directly because the necessary financing and SEC and bank approvals could not be arranged within the time period set by DLJ. Accordingly, the Investcorp Group agreed to supply the financing needed for the transaction by creating ABF Acquisition Corp. ("ABFAC") to purchase ABF. Three III officers, Hedley, Soldatos, and Tung, were installed as the officers and directors of ABFAC. ABFAC was capitalized with a $15 million capital contribution from its shareholders[4] and a $70 million loan from Chemical Bank unconditionally guaranteed by SA. On November 4, 1993, ABFAC paid $74,935,217 for ABF, and on November 5, 1993, ABFAC incurred various additional fees of $4,287,500 in connection with the acquisition.[5] ABFAC then granted Color Tile an option to purchase ABF.
In addition to the ABF assets, on November 4, 1993, ABFAC also purchased 24 retail stores which operated under the names "Mrs. Kay's" and "Kay and Kay Tile Depot." On the same date, the Color Tile board approved, as "in the best interests of [Color Tile] and its stockholders," the purchase of these retail assets from ABFAC for $1,754,000.
On December 7, 1993, Color Tile created a wholly-owned subsidiary, ABWF, for the purpose of exercising the option to purchase ABF from ABFAC. On December 15, 1993, Color Tile's board executed a unanimous written consent approving, as "in the best interests of [Color Tile] and its stockholders," the assignment of Color Tile's option to purchase ABF to ABWF. On December 17, 1993, Color Tile's board executed another written consent approving, as "in the best interests of [Color Tile]," an $80 million capital contribution *507 to ABWF in order to facilitate the purchase of ABF. ABWF then paid $80 million to ABFAC for ABF. ABFAC distributed $15 million of the $80 million to the ABFAC shareholders and repaid the remaining $65 million balance on the Chemical Bank loan which had been unconditionally guaranteed by SA. Color Tile stated in its 1993 10-K that the $80 million purchase price, including fees and expenses, "reflects the same price paid by ABF[AC] for the ABF assets, adjusted to reflect [$4.3 million] payable to certain Investcorp affiliates ... and the reimbursement of transaction costs incurred in connection with such acquisition."
Ultimately, the ABF assets were not as profitable as Color Tile's projections had predicted. In the Fall of 1994, Color Tile received an additional $29 million term loan from its bank group. In June 1995, Investcorp entities lent $15 million to Color Tile (which they later contributed to Color Tile's capital); in September and October 1995, Investcorp entities made an additional $15 million contribution and arranged an additional $15 million loan from Chemical Bank. Nevertheless, on January 24, 1996, Color Tile and CT Holdings each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.
The plaintiff in this action is the Official Committee of the Unsecured Creditors which was appointed in the 1996 bankruptcies of Color Tile and CT Holdings. The Committee is empowered to prosecute certain claims on behalf of the estates of Color Tile and CT Holdings pursuant to a September 17, 1997 Order of the United States Bankruptcy Court for the District of Delaware which approved the Global Settlement Agreement among Color Tile, CT Holdings, the Committee, and other entities.

DISCUSSION

Summary Judgment Standard
Summary Judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This requires that the party opposing summary judgment "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Claim One
Claim One alleges that Kirdar, Hallak, and Merritt, as well as the four Cayman Island corporations that were voting shareholders of Color Tile, CIP, Ltd., and SA violated their duty of loyalty to Color Tile by causing Color Tile "to purchase the ABF assets for an unfair price, permitting Investcorp to take $4 million in fees and causing Color Tile to take on an imprudent and unmanageable debt structure to finance the purchase of the ABF assets." The plaintiff refers to these defendants *508 collectively as the "CT Holdings Controlling Shareholders."
Under Delaware law, a shareholder owes a fiduciary duty to a corporation only if it (1) owns a majority interest in the corporation, or (2) exercises control over the business affairs of the corporation. Ivanhoe Partners v. Newmont Mining Corp., 535 A.2d 1334, 1344 (Del.1987). It is undisputed that no one defendant owned a majority of the CT Holdings shares, although SA was assigned 52% of CT Holdings' voting proxies. However, even if there were sufficient evidence for a reasonable jury to find that each of these shareholder defendants owed a fiduciary duty to Color Tile, plaintiff has failed to present sufficient evidence for a reasonable jury to conclude that these defendants breached a duty of loyalty to Color Tile.
Plaintiff offers two theories in support of its claim that the shareholder defendants have violated their duty of loyalty. First, plaintiff contends that the ABF acquisition constituted self-dealing between the shareholder defendants and Color Tile. Alternatively, plaintiff argues that there was a conflict of interest between the shareholder defendants and the other Color Tile shareholders.

Self-Dealing
"Where a controlling shareholder stands on both sides of a transaction, the standard ordinarily is that the controlling shareholder (and the directors who are subject to that control) will bear the burden of proving the entire fairness of the transaction." In re MAXXAM, Inc., 1997 WL 187317, at *13 (Del.Ch. April 4, 1997).[6] Plaintiff argues that the transfer of $80 million from ABWF to ABFAC represented a transaction between Color Tile and its controlling shareholders and thus should be subject to the entire fairness test. In particular, plaintiff points to the fact that on November 4, ABFAC purchased ABF and gave Color Tile an option to buy ABF from ABFAC. Color Tile then exercised this option, through its subsidiary ABWF, on December 17.
Plaintiff's characterization of this transaction as "self-dealing" is inaccurate because it focuses on the form of the transaction, not the substance. While technically Color Tile held only an option to purchase ABF, the option agreement was the form used to protect Color Tile in the event that Color Tile was unable to arrange the requisite financing through the Senior Notes offering. Thus, ABFAC was created merely to enable Color Tile to purchase ABF. In the Prospectus accompanying the Senior Notes offering, Color Tile noted that ABFAC "agreed to acquire the ABF assets to facilitate the acquisition of such assets by [Color Tile] pending the receipt of the proceeds from this Offering... the acquisition of the ABF Assets and the receipt of certain required governmental consents."
ABFAC was created through capital contributions from ABFAC shareholders and from a Chemical Bank loan. After receiving the $80 million payment from ABWF on December 17, ABFAC distributed the entire proceeds to repay the capital contributions, and ABFAC effectively was left with $0 in net assets. There is no evidence to suggest anything other than that, at all times, all parties anticipated that Color Tile would acquire ABF. When Larry Nagle, the former President of Color Tile, was asked at his deposition, whether he thought Color Tile was free to decide not to buy ABF once Investcorp had acquired ABF, Nagle replied, "No. That's *509 ridiculous." (Nagle Tr., 143-44). Furthermore, as Color Tile noted in its 1993 10-K, ABWF paid ABFAC the precise amount that ABFAC itself had paid (adjusted to reflect various fees). Plaintiff attempts to characterize this transaction as "self-dealing." However, there is no evidence that Color Tile's acquisition of ABF was a transaction with ABFAC, although it was a transaction facilitated by ABFAC.
To the extent that plaintiff is asserting that the shareholder defendants forced Color Tile to engage in the ABF transaction under this two-step structure in order to procure $4.3 million in transaction fees, plaintiff's claim again fails. The Delaware Supreme Court has stated that to show self-dealing, a plaintiff must show that the shareholder defendants received something "to the exclusion of, and detriment to, the minority stockholders." Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del.1971). First, there is no rational basis for a jury to conclude that $4.3 million in fees in the context of an $80 million transaction constituted a meaningful benefit. Second, plaintiff has not proffered any evidence that Color Tile would not have incurred similar fees had the transaction been structured as a purchase by Color Tile directly from ABF.

Conflict of Interest
Alternatively, plaintiff argues that the standard of entire fairness should apply because "there is substantial evidence in the record from which a jury could find that the interests of the shareholder defendants in pursuing the ABF Transaction were different from and antagonistic to the interests of Color Tile." In particular, plaintiff argues that the shareholder defendants supported the ABF acquisition in order to add "sizzle" to Color Tile and make Color Tile appear more attractive for an eventual public offering of the company's stock which would enable the shareholder defendants to cash out their investment in Color Tile. Plaintiff contends that this desire was at odds with the interests of the non-voting shareholders and the preferred shareholders of Color Tile stock. However, plaintiff has not proffered evidence of such a conflict of interest. All the evidence demonstrates that the interests of the shareholder defendants were aligned with, and not in conflict with, the interests of all the other shareholders. Delaware law does not hold corporate decision-makers "liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky!  you supply the adverb) ... [T]his stupefying disjunction between risk and reward for corporate directors threatens undesirable effects." Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1052 (Del.Ch.1996).

(a) Conflict with Common Shareholders
As noted, there were two classes of Color Tile common shareholders: Class D (comprised of most shareholder defendants) and Class C (comprised of Color Tile employees). If the ABF transaction had been successful, every common shareholder would have benefitted if the company had gone public. In their depositions, a number of Class C shareholders testified that they hoped for an IPO, and they understood the financial benefits that an IPO would create for them. See, e.g., Bethscheider Tr., 34-35; Kinler Tr., 25-26; Brown Tr., 191-93. Similarly, an unsuccessful ABF acquisition would have injured all shareholders. Plaintiff asserts that the Class C shareholders ran a greater risk with respect to the ABF transaction because if the transaction failed, the employee shareholders ultimately would lose their jobs and livelihood. In fact, *510 plaintiff contends that Gilmartin, Lesok, and Nagle only approved the ABF transaction because they feared that if they opposed it, they would be replaced by the shareholder defendants. Plaintiff relies on Delaware cases which indicate that the ability to affect the continued employment of directors can create a reasonable doubt as to the independence of those directors. See, e.g., Rales v. Blasband, 634 A.2d 927, 936 (Del.1993); Friedman v. Beningson, 1995 WL 716762, at *5 (Del.Ch. Dec.4, 1995); Kahn v. Tremont Corp., 1994 WL 162613, at *2 (Del.Ch. April 21, 1994). However, each of those cases was decided on a motion to dismiss on the face of the complaint. On a motion to dismiss, it is assumed that evidence will be developed to support the factual allegations of the complaint. After the completion of discovery, to defeat a motion for summary judgment, the party with the burden of proof must proffer admissible evidence of each essential element of the claim. The only evidence in the record on this point directly refutes plaintiff's speculation. Gilmartin, Lesok, and Nagle each testified that his decision to approve the ABF transaction was not influenced by the fear of losing his job.[7] Moreover, Gilmartin, Lesok, and Nagle personally owned Class C shares of Color Tile, and each was aware of the substantial financial risks, and potential gains, involved in Color Tile's acquisition of ABF.[8] Nevertheless, these individuals approved each of the various requisite steps for the ABF transaction by signing unanimous written consents which expressly contained language that they believed the transaction was "in the best interests" of Color Tile.
Although plaintiff contends that a reasonable jury could conclude that Gilmartin, Lesok, and Nagle merely deferred to the desires of Investcorp, and none of them truly believed that the ABF transaction was beneficial to Color Tile, each of them signed consents expressly containing "best interests" language. Moreover, Gilmartin, Lesok, and Nagle have stated that they approved the ABF transaction because they believed it to be in the best interests of Color Tile. See Gilmartin Tr., 183 ("Well, did you do anything in connection with the ABF acquisition which you did not believe to be in the best interest of the company and its stockholders? No, sir."); Nagle Tr., 245 ("Did you believe at the time you voted in favor the acquisition of the ABF assets by Color Tile that that *511 vote was in the best interests of Color Tile? Yes."). See also Eddie M. Lesok's and N. Laurence Nagle's Answer to Third Party Complaint of III With Counterclaims, Kurzweil Aff. Ex. 43, at 9 (Lesok and Nagle state that they "authorized the AFB [sic] acquisition and the Senior Notes offering because they believed each of those transactions to be in the best interest of Color Tile").

(b) Conflict with Preferred Shareholders
Plaintiff's claim that there was a conflict of interest between the shareholder defendants and the preferred shareholders is also unsupported by the evidence. Color Tile had two classes of preferred stock: Redeemable Senior Preferred and Series A Senior Increasing Rate Preferred. Shareholders in each of these classes stood to benefit from a successful ABF transaction. As noted in the Form S-1 filed in conjunction with the Series A stock, in the event of an IPO, Color Tile was required to use the proceeds of the IPO to repurchase the Series A shares "at a purchase price equal to the optional redemption price (as set forth in the Certificate of Incorporation) prevailing on the date that Color Tile applies the proceeds of the public offering to purchase such shares, together with accrued and unpaid dividends thereon to the date of purchase, in cash without interest." Color Tile, Form S-1, at 44-45. For example, if there was no IPO, Color Tile was required to redeem the Series A shares for $25.00/share on January 25, 2003. However, if an IPO occurred in late 1994, the optional redemption price applicable for that period would require Color Tile to redeem the Series A shares for $25.75/share. Id. at 43. Accordingly, under this hypothetical scenario, the Series A shareholders would receive $0.75 more per share and would receive these funds nine years earlier than they would have had no IPO occurred. Similar benefits would accrue if the date in the hypothetical is varied.
Additionally, there was no conflict of interest between the common shareholders and the Redeemable Senior Preferred shareholders. Pursuant to a Registration Rights Agreement, the holders of at least 50% of the outstanding shares of the Redeemable Senior stock were entitled to request registration of their securities on the earlier of January 1, 1993 and 90 days after Color Tile sold public equity. Id. at 41.[9] Although an IPO subsequent to the December 1993 ABF acquisition would not have given these preferred shareholders any additional rights to register their shares, these shareholders would nevertheless have benefitted from a future IPO. If these shareholders exercised their prerogative and sought registration of their stock, regardless of whether that decision was triggered by the advent of January 1, 1993 or by the commencement of public sales of Color Tile equity securities, an IPO would enhance the value and liquidity of these preferred shares, just as it would enhance the value of the common shares.
Thus, each of the preferred shareholders, like the common shareholders, stood to benefit from a successful ABF acquisition and a future IPO, and plaintiff cannot show that any benefit to the shareholder defendants would injure any of the preferred shareholders, an essential element of the claim. Moreover, to the extent that any conflict did exist, Chancellor *512 Allen has noted that "generally it will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock  as the good faith judgment of the board sees them to be  to the interests created by the special rights preferences, etc., of preferred stock where there is a conflict." Equity-Linked Investors, L.P. v. Adams, 705 A.2d 1040, 1042 (Del.Ch.1997). Thus, while a board is required to respect the contractual rights and protections conferred on the preferred shareholders by their stock certificate, "the imposition by the board of ... economic risks upon the preferred stock which the holders of the preferred did not want" by virtue of a board decision "taken for the benefit largely of the common stock," does not constitute a breach of duty. Id.
Plaintiff's reliance on Hamilton v. Nozko, 1994 WL 413299 (Del.Ch. July 27, 1994) is misplaced. In Hamilton, the plaintiffs claimed that the shareholder defendants "in order to benefit themselves, breached their fiduciary duty to the minority stockholder class by taking actions intended to deprive them of a market for their shares." Id. at *1. The plaintiffs alleged that the defendants sought to terminate the company's registration and listing of common stock so that a public market in the stock could not be maintained. The defendants argued that there could not be a breach of fiduciary duty because all shares had been delisted and rendered unmarketable. Id. at *7. However, although the court conceded that all shares had been affected equally, not all shareholders were affected equally. Specifically, the court found that the delisting "made [the minority shareholders] vulnerable to a forced sale at an unfair price," but it did not adversely affect the shareholder defendants who intended "to enlarge their majority control" and thus did not want to sell their shares. Id.
The present action is distinguishable from Hamilton because all shareholders would benefit if the ABF acquisition were profitable, and all shareholders would be adversely affected if the value of the shares declined.

Claim 2
Claim Two alleges that Loeb and Soldatos, as directors of Color Tile, breached their fiduciary duty of loyalty to Color Tile. I have previously held that plaintiff failed to produce evidence that Loeb, an outside director, breached his fiduciary duty of loyalty. See Transcript, December 14, 2000, at 43-44. The claim against Soldatos fails for reasons similar to the reasons for the failure of the breach of loyalty claim against the shareholder defendants.
The complaint alleges that Soldatos had a "primary and overriding loyalty to the Investcorp Group" because he "was an officer of III and an executive of [Investcorp] SA." In order to support a duty of loyalty claim against Soldatos, plaintiff must proffer evidence that Soldatos had a material and substantial self-interest in the ABF acquisition and financing. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 362 (Del.1993); Goodwin v. Live Entertainment, Inc., 1999 WL 64265, at *24 (Del. Ch. Jan 25, 1999). Plaintiff offers two theories to support this position. First, plaintiff asserts that as a director and officer of ABFAC and a director of Color Tile, Soldatos stood on both sides of the transaction. See Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc., 532 A.2d 1324, 1333 (Del.Ch.1987) (holding that "directors who are employees of and controlled by [the] majority stockholders [stand] on both sides" of the transaction if the transaction is with the majority shareholders); Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1169 (Del.1995) ("classic self-dealing" exists where a director "is an officer or director of a firm that deals *513 with the corporation"). However, as discussed previously, treating the ABF acquisition as a transaction between Color Tile and ABFAC ignores reality. The ABF acquisition was a transaction between Color Tile and ABF that was facilitated by ABFAC. Soldatos had no connection with ABF and thus, it is inaccurate to portray Soldatos as an actor on both sides of the ABF acquisition.
Alternatively, plaintiff contends that Soldatos lacked independence in evaluating the ABF acquisition because his fundamental and overriding loyalty was to Investcorp, not to Color Tile. However, this argument is also based on a flawed premise that the interests of the Investcorp shareholders and the other shareholders of Color Tile were not aligned. As described previously, plaintiff has failed to present evidence from which a reasonable jury could conclude that this alleged conflict of interest actually existed.
In addition to plaintiff's failure to proffer evidence that Soldatos personally had divided loyalty when he approved the ABF transaction, a breach of loyalty claim against a director cannot succeed without proof that a majority of the board had a material interest in, or lacked independence with respect to, the challenged transaction. Cinerama, 663 A.2d at 1170. See also Williams v. Geier, 671 A.2d 1368, 1378 (Del.1996) (dismissing breach of fiduciary duty claim because "no evidence [was] adduced to show that a majority of the [b]oard was interested or acted for purposes of entrenching themselves in office"). In this case, the three management directors, Gilmartin, Lesok, and Nagle, comprised a majority of the Color Tile board that approved the ABF transaction. Plaintiff does not allege that Gilmartin, Lesok or Nagle had a material interest in the transaction, rather that these directors were not truly independent. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Rales, 634 A.2d at 936 (quoting Aronson v. Lewis, 473 A.2d 805, 816 (Del.1984)). However, plaintiff has failed to present sufficient evidence for a reasonable jury to conclude that a majority of the board lacked independence.
Plaintiff points to the fact that Gilmartin, Lesok, and Nagle each "recognized that Investcorp could fire them at any time." (Pl.Br., 54) (emphasis added). Accordingly, plaintiff hypothesizes that a reasonable jury could conclude that the directors did not properly evaluate the merits of the ABF transaction because they feared that the Investcorp shareholders would remove them if they did not approve the acquisition. But, as discussed previously, Gilmartin, Lesok, and Nagle each testified that he was not concerned with the possibility of losing his job. Furthermore, Gilmartin, Lesok, and Nagle each owned Color Tile stock. Delaware law presumes that shareholders in a company "act in their own best economic interests when they vote." Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d 1361, 1380 (Del. 1995); Gropper v. North Cent. Tex. Oil Co., 114 A.2d 231, 234 (Del.Ch.1955) (when directors own shares in a company, if they "participated in a bad bargain, they have injured themselves").
Plaintiff also asserts that Gilmartin, Lesok, and Nagle deferred to the wishes of the Investcorp shareholders and did not adequately evaluate and consider the merits of the transaction. Plaintiff points out that Gilmartin, Lesok, and Nagle initially expressed some concern that Color Tile *514 was overpaying for ABF.[10] Additionally, plaintiff points to the fact that each of the management directors has acknowledged that the Investcorp shareholders had the authority, power, and ability to ensure that Color Tile would acquire the ABF assets, even if the board did not approve the transaction.[11] However, the fact that Gilmartin, Lesok, and Nagle acknowledged that Investcorp had the authority and power to ensure that the transaction would occur does not provide the necessary evidence that, contrary to their testimony, they did not believe the transaction to be in the best interests of Color Tile.[12] Thus, the evidence does not support plaintiff's speculation that the management directors deferred to the shareholder defendants' wishes, and there is no basis for concluding that the business judgment presumption can be rebutted.

Claim 3
Color Tile's Certificate of Incorporation contains an exculpation provision, pursuant to Section 102(b)(7) of Delaware's General Corporation Law, which prevents plaintiff from suing a Color Tile director for a breach of the duty of care unaccompanied by a breach of the duty of loyalty. Color Tile's Certificate of Incorporation, Amended as of December 23, 1986. See Del.Code Ann. tit. 8 § 102(b)(7) (allowing amendment to corporate charter to exonerate directors from monetary liability for breaches of fiduciary duty of care not involving bad faith, intentional misconduct, improper payment of dividends, improper stock purchase or redemption or breach of duty of loyalty); Emerald Partners v. Berlin, 726 A.2d 1215, 1224 (Del.1999) ("[W]here the factual basis for a claim solely implicates a violation of the duty of care, this Court has indicated that the protections of such a charter provision may properly be invoked and applied."). Nevertheless, plaintiff claims that the shareholder defendants breached a fiduciary duty of care "by acting negligently, carelessly and contrary to informed business judgment in setting the terms and conditions" of the ABF transaction and "forcing Color Tile to consummate the Transaction."
Even if the shareholder defendants are treated as controlling shareholders, Delaware law does not seem to impose a duty of care on controlling shareholders in cases in which there is no breach of the duty of loyalty. The board of directors owes a "triad" of fiduciary duties to the corporation: loyalty, due care and good faith. McMullin v. Beran, 765 A.2d 910, 917 (Del.2000); Emerald Partners, 726 A.2d at 1221. An independent duty of care has been recognized in certain contexts. See, e.g., Paramount Communications, Inc. v. QVC Network, Inc., 637 A.2d 34, 44 (Del.1994) (involving sale of corporate control); Grobow v. Perot, 539 A.2d 180, 189 (Del.1988) (repurchase of stock); Merchants' Nat'l Properties, Inc. v. Meyerson, 2000 WL 1041229, at * 7-8 (Del.Ch. July 24, 2000) (purchase of minority interest in interested director's company); York Linings v. Roach, 1999 WL 608850, at *2 (Del.Ch. July 28, 1999) (management of corporate funds).
*515 Controlling shareholders have a fiduciary duty to minority shareholders. See, e.g., Kahn v. Lynch Communication Sys., Inc., 669 A.2d 79, 84 (Del.1995); Paramount Communications, 637 A.2d at 47; Singer v. Magnavox Co., 380 A.2d 969, 976 (Del.1977). However, while there are cases in which Delaware courts have referred to a duty of care for controlling shareholders, each of those cases involved controlling shareholders who breached their duty of loyalty by acting to benefit themselves to the detriment of the minority shareholders. See, e.g., Summa Corp. v. Trans World Airlines, Inc., 540 A.2d 403, 406 (Del.1988) (finding that majority shareholder of airline breached fiduciary duty to minority shareholders by failing to place earlier orders for jets and forcing airline to enter into leases for aircraft, but stating "[majority shareholder] acted for its sole benefit at the expense of its fiduciary duties to TWA's minority shareholders"); Cinerama, Inc. v. Technicolor, Inc., 1991 WL 111134, at *19-20 (Del.Ch. June 24, 1991) (noting that a majority shareholder in a cash-out merger assumes the duties of care and loyalty when he exercises power directing actions of corporation in cashing out the minority shareholders); Harris v. Carter, 582 A.2d 222, 235-36 (Del.Ch.1990) (finding that a duty of care may be imposed on majority shareholders in the context of a "sale of corporate control" by the majority shareholders).
Plaintiff argues that "there is no conceivable reason why Delaware would pick and choose applying a duty of care to a fiduciary in some cases but not others." However, plaintiffs cannot point to a single instance in which a shareholder's duty of care was recognized in the absence of a breach of the duty of loyalty. The purpose of treating controlling shareholders as fiduciaries to ensure that the controlling shareholder does not abuse its position of control to obtain some benefit to the detriment or exclusion of the minority shareholders  argues against the imposition of a separate duty of care in circumstances in which the interests of all the shareholders are aligned.
Moreover, plaintiff does not contend that the shareholder defendants individually took any specific actions to breach a duty of care, rather plaintiff argues that the shareholder defendants are vicariously liable for breach of their duty of care by Soldatos as their agent. Plaintiff contends that there is sufficient evidence for a reasonable jury to conclude that Soldatos acted as the shareholder defendants' agent on the Color Tile board and thus the shareholder defendants should be liable for Soldatos' actions. Plaintiff's agency theory leads to an anomalous result in this case. Each of the Color Tile directors was shielded from personal liability by the inclusion of the Delaware General Corporation Law's exculpation provision in Color Tile's certificate of incorporation. Enabling plaintiff to sue the shareholder defendants for acts of Soldatos for which Soldatos personally cannot be held liable would provide an illogical end-run around the protections of § 102(b)(7). Ordinarily, a principal cannot be sued for acts of an agent for which the agent cannot be sued.

Claim 4
Plaintiff claims that III aided and abetted breaches of the fiduciary duties of loyalty and care by Soldatos, Loeb, and the shareholder defendants. To succeed on a claim of aiding and abetting a breach of fiduciary duty under Delaware law, a plaintiff must prove (1) the existence of a fiduciary duty; (2) a breach of that duty; (3) knowing participation in the breach; and (4) damages resulting from the concerted action of the fiduciary and the aider and abettor. Nebenzahl v. Miller, 1996 WL 494913, at *7 (Del.Ch. Aug.26, 1996). Since plaintiff is unable to prove a breach *516 of fiduciary duty by Soldatos, Loeb or the shareholder defendants, the aiding and abetting claim against III necessarily fails. Malone v. Brincat, 722 A.2d 5, 14-15 (1998); Nebenzahl, 1996 WL 494913, at *7.

Claim 5
Plaintiff claims that III breached its fiduciary duty of loyalty to Color Tile "by causing Color Tile" to engage in the ABF transaction even though III "knew that the Transaction was in the best interests of the Investcorp Group, and that it was detrimental to the interests of Color Tile." As discussed above, plaintiff has not proffered evidence to support the underlying premise of this claim  that there was a conflict between the interests of the Investcorp investors and Color Tile's other shareholders. The fact that Investcorp's interests were wholly aligned with the interests of Color Tile and its shareholders makes the breach of loyalty claim against III untenable.

Claims 6 and 7
Color Tile entered into a management advisory agreement with III, under which III was paid $500,000 per year. Pursuant to the terms of that agreement, III was to provide Color Tile with advice concerning management, financing, and marketing and was to assist in "strategic planning." With respect to the ABF acquisition, there is evidence that III was involved in the price negotiations, assisted in arranging the necessary bank financing, structured the deal, helped select the due diligence team, and advised management regarding the merits of the transaction. See Lesok Tr., 140-41, 148, 173-76, 338-39; Nagle Tr., 180-81, 209-10; Gilmartin Tr., 1033.[13]
Plaintiff asserts that in carrying out these duties, III acted negligently. In Claim Six, plaintiff describes this alleged negligence as a breach of the duty of care; in Claim Seven, plaintiff describes this as common law negligence. Although plaintiff has asserted these as two distinct claims, to a large extent, the claims are overlapping. See Kwiatkowski v. Bear Stearns & Co., Inc., 126 F.Supp.2d 672, 685 (S.D.N.Y.2000). There is no evidence proffered that III acted in bad faith. However, since negligence is a mixed question of fact and law, and the facts have not been clearly enough developed in the submissions on this motion, there appears to be a genuine issue of disputed fact that cannot be resolved by summary judgment. Accordingly, defendants' motion for summary judgment on Claims Six and Seven is denied.

Claim 19
In Claim Nineteen, plaintiff seeks to avoid the purchase of ABF from ABFAC and to recover the purchase price on the ground that the price paid was unfair and constituted a "fraudulent conveyance" under Sections 274 and 275 of the New York Debtor and Creditor Law and Section 550 of the Bankruptcy Code. NYDCL §§ 274, 275; 11 U.S.C § 550. Plaintiff has named as defendants on this claim, SA, III, ABFAC, EC, AIBC, and the 10 Cayman Island companies affiliated with ABFAC.
Plaintiff initially claimed that it did not receive fair consideration for the $80 million paid by Color Tile, through ABWF, (which includes the $4.3 million in fees paid *517 by ABFAC in connection with the ABF transaction) or the $1.754 million paid by Color Tile to ABFAC for the ABF retail stores. In the Committee's Supplemental Answer to Defendants' Damage Interrogatories, plaintiff has indicated that it no longer seeks recovery of the $4.3 million in fees paid by ABFAC or the $1.754 million paid for the ABF retail stores. (Pl.Br., 12, n. 1).
Section 550 of the Bankruptcy Code provides that "to the extent that a transfer is avoided under § 544, 545, 547, 548 ... the trustee may recover ... the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." Plaintiff asserts its fraudulent conveyance claim under the New York Debtor and Creditor Law pursuant to § 544(b) of the Bankruptcy Code. Compl., ¶ 19; See 11 U.S.C. § 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim...."). Defendants contest the application of New York's Debtor and Creditor Law and argue that Delaware's law governs.
Defendants contend that the $80 million transferred was not a payment from Color Tile to ABFAC directly, but rather a capital contribution by Color Tile to ABWF and a subsequent transfer by ABWF to ABFAC. Accordingly, defendants argue that ABWF, not ABFAC, should be characterized as the "initial transferee." Furthermore, defendants argue that § 550 imposes a requirement that Color Tile first "avoid" the transfer to the initial transferee before seeking recovery of the transferred funds from subsequent transferees, and that plaintiff's failure to sue ABWF to avoid the initial transfer precludes this claim against the defendants.
Essentially, defendants contend that ABWF is an indispensable party to this proceeding to avoid the transfer and restore the parties to their status prior to the transfer. Because neither side has submitted sufficient information about ABWF's current status and the current location of the business in question or its assets, it is impossible to determine whether ABWF is an indispensable party. Accordingly, the parties are directed to submit those facts.

CONCLUSION
For the foregoing reasons, defendants' motion for summary judgment is granted with respect to Claims One through Five, and denied as to Claims Six and Seven. As to Claim Nineteen, the parties are directed to submit the necessary facts by May 7, 2001.
Oral argument will be held on the third party motions to dismiss the counterclaims on May 9, 2001 at 10 A.M.
SO ORDERED.
NOTES
[1] III is a wholly owned subsidiary of SA and provided management consultant services to some of SA's portfolio companies, including Color Tile.
[2] Kirdar and each of the Cayman Island companies transferred control of their voting stock in CT Holdings to SA.
[3] The cash portions of the other bids ranged from $40 million to $55 million; the remainder of the consideration took the form of either a note from the seller and/or an equity participation by the seller.
[4] Essentially, five Cayman Island companies (Investcorp Investment Holdings, Ltd., Acquisition Capital, Ltd., Corporate Capital, Ltd., Funding Capital, Ltd., and Planning Capital, Ltd.) contributed the $15 million to five other Cayman Island companies (Window Investments, Ltd., Blinds Equity, Ltd., Blinds Holdings, Ltd., Shades Investment, Ltd., and Shades International, Ltd.). These latter Cayman corporations then transferred the funds to ABFAC through bank accounts maintained at EC.
[5] On November 5, 1993, ABFAC made four additional payments: 1) a $1.5 million loan commitment fee to AIBC Investcorp Finance B.V. ("AIBC") in consideration of a commitment to lend funds to ABFAC; 2) a $700,000 loan guarantee fee to SA in consideration of its loan guarantee; 3) a total of $575,000 in equity placement fees to the ABFAC shareholders who had contributed the $15 million in capital; and 4) $1,512,500 to III for merger and loan finance advisory fees.

ABFAC repaid $5,000,000 of the $70 million Chemical Bank loan on November 19. ABFAC paid $265,822.87 in interest on the Chemical Bank loan when it repaid the remaining $65 million loan balance.
[6] The concept of "entire fairness" encompasses fair dealing and fair price. Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1162-63 (Del.1995).
[7] Gilmartin (Gilmartin Tr., 1033):

Q: And was it your understanding that if you didn't support a significant course of action recommended by Investcorp you could lose your job if they wanted to?
A: I don't believe that ever crossed my mind.
Lesok (Lesok Tr., 489):
Q: Did you vote in favor of the acquisition of the ... ABF assets by Color Tile because of any concern that you would lose your job at Color Tile if you did not vote that way?
A: That was not an issue that was on my mind at the time.
Nagle (Nagle Tr., 240):
Q: Did you vote in favor of the acquisition of the ABF assets by Color Tile because of any concern that you would lose your job at Color Tile if you did not vote that way?
A: No.
Moreover, the assertion that there was a conflict of interest simply because the Class C shareholders would have wanted to protect their future livelihood suggests that there would always be a conflict of interest between management shareholders and non-management shareholders when approving a risky transaction. That is not the law.
[8] Gilmartin, Color Tile's CFO, testified that he was an active participant in the due diligence process and kept Lesok and Nagle apprised of developments during due diligence. (Gilmartin Tr., 301, 321-22). Furthermore, Lesok, Nagle, and Gilmartin were present for at least one formal presentation given by Coopers & Lybrand outlining the state of due diligence and received a written due diligence report in August 1993. (Lesok Tr., 134-37).
[9] Color Tile would then be obligated to file a registration statement or pay increased dividends to these preferred shareholders pending filing of the registration statement. See Color Tile & Carpet Private Placement Memorandum on 2,000,000 Shares Series A Senior Increasing Rate Preferred Stock, at 52.
[10] See Lesok Tr., 346, 349; Nagle Tr., 186-87; Gilmartin Tr., 325-26, 594-96.
[11] See Lesok Tr., 266, 349; Nagle Tr., 148, 154, 155-56; Gilmartin Tr., 74-75.
[12] For example, immediately following Gilmartin's comment that "as a practical matter, Investcorp owned 90 plus percent of the stock and ... had a significant say in what was decided in board meetings," Gilmartin testified that he did not mean to imply that he did not believe that the ABF transaction was in the best interests of Color Tile. (Gilmartin Tr., 75).
[13] Gilmartin, Lesok, and Nagle do not specifically name III. Rather, they continuously refer to "Investcorp." Similarly, plaintiff lumps together all Investcorp entities and affiliates and uses the term "Investcorp" to refer both to all of the shareholder defendants and to III. See, e.g., Pl. Br., 31, 59. Nevertheless, there is evidence that employees of III, including Hedley and Soldatos, did participate in these activities. See Katzman Tr., 205, 269-70; Soldatos Tr., 182 (7/22), 74 (7/23); Gilmartin Tr., 895, 901, 1034; Lesok Tr., 160, 186, 191.